543 P.2d 128

**STATE of Arizona, Appellee,**

v.

**Jonathan Collins GRANGE, Appellant.**

**No. I CA–CR 973.**

Court of Appeals of Arizona, Division 1, Department A.

Dec. 11, 1975.

Rehearing Denied Jan. 9, 1976.

Review Denied Feb. 3, 1976.

Bruce E. Babbitt, Atty. Gen., William J. Schafer III, Chief Counsel, Crim. Div., by R. Wayne Ford, Asst. Atty. Gen., Phoenix, for appellee.

Lewis & Roca by John P. Frank, David L. Cocanower, Michael W. McNamara, Phoenix, for appellant.

## OPINION

DONOFRIO, Judge.

This is an appeal from judgments of conviction and sentences for assault with a deadly weapon, A.R.S. § 13–249(B), and conspiracy to assault and/or rob, A.R.S. § 13–331(A). Appellant was given a sentence of 10 to 20 years on the assault conviction and of 5 to 15 years on the conspiracy conviction, sentences to run concurrently. He had raised four questions for our consideration on appeal:

1) Was the conspiracy conviction based on the uncorroborated evidence of a co-conspirator?

2) Was appellant's statement made to an F.B.I. agent freely, voluntarily, and intelligently given?

3) Does the record support the conviction?

4) Is the sentence proper?

The facts necessary to consider the questions raised by appellant indicate that on the night of July 14, 1974 two undercover-narcotics agents were injured when a shot hit their car as it traveled in an isolated area of Yavapai County on the Dugas Road, near Dugas, Arizona. For his participation in this, appellant was convicted of assault with a deadly weapon and conspiracy to rob and/or assault the two agents. One of the injured agents, Mike Tanaka, was an officer of the Honolulu, Hawaii Police Department. How he came to be in Arizona in an official capacity is an interesting intrigue. In June of 1974 appellant was in Honolulu where he met with Tanaka, an undercover narcotics officer, and Tanaka purchased several pounds of marijuana from appellant. As a result of this meeting and transaction the two parties discussed the possibility of Tanaka purchasing a quantity of cocaine from appellant. Appellant returned to Arizona and the cocaine transaction was further discussed by telephone. The deal was ultimately agreed upon for the sale of three pounds of cocaine for approximately $36,000 to be completed in Arizona. The evidence indicates that appellant Grange had been robbed or "ripped off" of either some Indian jewelry or a quantity of marijuana (depending on the testimony) while in Hawaii and he was under the impression that Tanaka or someone associated with him was responsible. Needless to say, Grange did not know of Tanaka's police status, and referred to him as being a "syndicate" man.

Tanaka made contact with the Federal Drug Enforcement Administration (DEA) when the cocaine deal was finalized by telephone, and eventually flew to Phoenix, Arizona, on July 11, 1974 as Grange had apparently instructed him by telephone. On arrival in Phoenix, Tanaka took possession of an envelope from the Hertz car rental counter at the airport that had been left for him by Grange's now associate, Brett Byrd. The envelope contained a map of a proposed meeting place at Cherry, Arizona, a note to Tanaka from Grange, and a "taste" of the cocaine.

Grange had met Byrd through his employment at a Phoenix hotel. Grange, Byrd, and a co-defendant, Christopher Stillman, became companions and were living at this time at a ranch owned by Stillman at Cherry, Arizona. The apparent plan of the three was to rob Tanaka and his associates (now DEA agents) of the money to be used to purchase the cocaine. Grange would thereby recover his loss in Hawaii, and according to Byrd's testimony, Byrd was to be paid $500 for his participation. The three defendants purchased two-way radios and a shotgun and proceeded to Cherry where other weapons belonging to Grange could be obtained.

Tanaka and other DEA agents proceeded to Cherry in accordance with the instructions in the envelope, and there met Grange. Grange accompanied them to a nearby restaurant where they showed him the $36,000 for the cocaine purchase. The parties agreed to meet later that evening to complete the transaction. This meeting fell through, apparently when Grange and his two associates saw an airplane overhead at the Cherry Creek Lodge where they were then staying. They thought the airplane was carrying police agents. Tanaka was telephoned by Grange at Tanaka's hotel in Phoenix the following Monday, July 14, 1974. According to Grange's new directions Tanaka and the other DEA agents were to travel to the Dugas Road area that evening for the sale to be completed.

Stillman was the driver of the car that brought Grange and Byrd to the isolated spot on Dugas Road that evening and he was to leave and return later to pick them up. Byrd was armed with the shotgun and Grange was armed with a .30–06 rifle and a .357 magnum pistol. They took up positions on opposite sides of the dirt and gravel road to await Tanaka.

The DEA agents and Tanaka meanwhile proceeded to the designated area in three cars. With Tanaka in his rental car was

Agent Martinez of the DEA who was injured with Tanaka. The agents proceeded down the road, saw no one, and were returning along the same road when the events causing their injuries occurred. Tanaka and Martinez were in the lead car, followed by another car with one DEA agent, and a third car followed at some distance behind. As the car containing Tanaka and Martinez passed his position on the road, Byrd testified that he suspected that these were narcotics agents and yelled to Grange on the opposite side of the road not to shoot. It was dark, and Byrd testified that he could not see Grange. A shot rang out, entering the roof of the lead vehicle, resulting in wounds to both Tanaka and Agent Martinez. The cars sped away, and Tanaka and Martinez were later flown to a Phoenix hospital. Byrd was later picked up on Dugas Road by Stillman, apparently as planned, and these two were later stopped and arrested that night in the vicinity by Yavapai County Sheriff's deputies who found the shotgun in Stillman's car. Grange apparently left the scene on foot and was arrested the next day some 17 to 20 miles away and 18 hours later. Byrd cooperated with the authorities in the investigation and gave statements implicating Grange. The F.B.I. originally took Grange into custody for assaulting a federal officer, but later it was determined that he would be tried on State charges. Byrd and Stillman reached agreements with the prosecutor's office and entered guilty pleas to reduced charges. Grange was tried to a jury and convicted. He did not testify.

It was determined that a high-powered rifle had fired the shot which injured Tanaka and Martinez, but the .30–06 that Grange carried was never found, although a shell casing was found at the scene of the shooting. Grange's hat was found nearby and a .357 magnum pistol similar to the one Grange owned, a blue jacket belonging to Grange, and other items were found a few miles away.

Grange was taken into custody by Sheriff's deputies, transported to Mayer, Arizona, and within minutes turned over to the F.B.I. agents who transported him to Phoenix. On the trip to Phoenix, Grange talked with the F.B.I. agents after signing a waiver of constitutional rights form given him earlier by the F.B.I. at Mayer. His statement to the F.B.I. agent in the car on the way to Phoenix indicated that he had been in the Dugas Road area the previous evening, that he had owned the weapons in question, and that he had handled the weapons that day. When asked about the shooting he stated that he had "never intentionally shot at any federal officers."

Appellant first asserts that the testimony of the alleged co-conspirator, Byrd, was not sufficiently corroborated and his conviction can therefore not stand because it was based entirely on Byrd's testimony. As noted previously, appellant was convicted of conspiracy to rob and/or assault under A.R.S. § 13–331(A). A.R.S. § 13–136 states:

"§ 13–136. Accomplice; testimony and corroboration

"A conviction shall not be had on the testimony of an accomplice unless the accomplice is corroborated by other evidence which, in itself and without aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

Our cases have interpreted that section to mean that independent evidence that tends in a slight way to connect a defendant with a conspiracy is enough to sustain the conviction. *State v. Elias*, 111 Ariz. 195, 526 P.2d 734 (1974); *State v. Sheldon*, 91 Ariz. 73, 369 P.2d 917 (1962); *State v. Smith*, 96 Ariz. 322, 395 P.2d 362 (1964). As our Supreme Court said in the *Sheldon* case, *supra:*

"The statute's (Section 13–136) primary requirement is that there be some evidence in the case which is legally sufficient to lend credibility to the statements of the accomplice. It must be evidence

which will afford the trier of fact a sufficient basis for *believing* the testimony of the accomplice. But it need not corroborate any particular part of the accomplice's testimony. (citations omitted) Nor need the 'corroboration * * * be by direct evidence [for] the entire conduct of the defendant may be looked to for corroborating circumstances and if from those circumstances, his connection with the crime may be fairly inferred, the corroboration is sufficient.'

\* \* \* \* \* \*

"In the last analysis, however, the facts of each case must govern. (citations omitted)" (emphasis theirs) 91 Ariz. 79, 369 P.2d 921, 922.

We turn now to the evidence that corroborated Byrd's testimony. F.B.I. Agent Chenoweth, who questioned Grange, testified that Grange discussed the Hawaiian "rip-off" of the Indian jewelry and that Grange held Tanaka responsible. Tanaka testified concerning calls he received in Hawaii from Grange in Arizona regarding the cocaine sale in Arizona, the amount and price. Tanaka came to Arizona per Grange's instructions, obtained the envelope at the Phoenix airport containing the map, note, and "taste" of cocaine, traveled to Cherry, Arizona, and met Grange there, and later received the telephone call from Grange that set up the ill-fated meeting on Dugas Road where Tanaka was shot. Grange's hat, pistol and jacket were found in the vicinity of the shooting, and an empty .30–06 shell casing was found at the scene. Stillman and Byrd were arrested after being discovered in Stillman's car near the shooting scene, and the shotgun was found in the car. Appellant Grange admitted to F.B.I. Agent Chenoweth that he had walked that night from Dugas Road to a location near Mayer, Arizona. We hold that this evidence corroborates the testimony of the co-conspirator, Byrd, and tends to connect the appellant with the offense of conspiracy to rob and/or assault the undercover agents.

Appellant next urges that his statement to F.B.I. Agent Chenoweth was inadmissible at trial because it was not freely and voluntarily given and was in violation of the rule of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant was arrested by a Yavapai County Sheriff's deputy on July 15, 1975, advised of his Miranda rights, and transported to the Sheriff's substation at Mayer, Arizona. At the substation he was again advised of his rights and his identity was confirmed by another deputy. Grange told the second deputy that he would like to call his attorney. He was not questioned, and the deputy said they would wait for higher authorities. Within minutes the F.B.I. agents arrived, advised appellant of his rights for the third time, and for the third time appellant indicated that he understood his rights. The F.B.I. agent then handed appellant a warning and waiver form and advised him to read it and sign it, which he did. The F.B.I. agents had no knowledge that appellant had previously asked to call his attorney. Appellant was then arrested and placed in the F.B.I. agents' car to return to Phoenix. In the car appellant was again advised of his rights. He stated that he understood them, that he would like to talk, and that he wanted to find out what the situation was. At a later point in the interrogation appellant stated that he would answer no more questions without the advice of counsel, and at that point the questioning ceased. We think the facts indicate his knowledge of his Miranda rights and a voluntary waiver.

Once a person is arrested and has asserted his right to counsel, he can change his mind for some reason satisfactory to himself and voluntarily submit to questioning. *United States v. Hodge*, 487 F.2d 945 (5th Cir. 1973). After the initial request for counsel is made, a later waiver by the accused can be voluntarily made, but the State bears a heavy burden of proving the voluntariness of the later waiver and any statements made. *United States v. Nielsen*, 392 F.2d 849 (7th Cir. 1968). We hold that the State has met its burden in the instant case. Appellant was advised of his rights at least four times;

he requested counsel after the second warning by the deputy sheriff (the F.B.I. was not aware of the request); he voluntarily signed the waiver; and before being questioned by Agent Chenoweth he was again warned and asked if he understood his rights. He indicated a willingness to be questioned, and when asked ultimately by Agent Chenoweth if he shot at anyone from the Dugas Road location the previous night he indicated he would stop answering and wanted an attorney before answering further. We hold that the facts indicate appellant's understanding of his rights and that his written waiver was freely and voluntarily given. His statement to Agent Chenoweth was therefore admissible at trial. For cases similar to the instant one where a request for an attorney was first made and later waived, and defendant's statements were held admissible, see *United States v. Grady,* 423 F.2d 1091 (5th Cir. 1970); *Nash v. State,* 477 S.W.2d 557 (Texas Cr.App.1972); *United States v. Barnawell,* 341 F.Supp. 619 (S.D.Cal.1972).

Appellant asserts that the conviction cannot be sustained on this record. This assertion is based on the allegation that the testimony of the accomplice is uncorroborated and that Grange's statement to the F.B.I. agent should be excluded. Since we have determined that there is sufficient corroboration and that Grange's statement was voluntarily and intelligently made, we find that there is ample evidence to support the conviction.

Finally, appellant asserts that the sentence imposed was improper as being both greater than that permitted by statute, and an abuse of the trial court's discretion. Appellant was sentenced under A.R.S. § 13–249(B) to not less than 10 nor more than 20 years after conviction for assault with a deadly weapon, and 5 to 15 years for conspiracy to rob and/or assault, A.R.S. § 13–331(A), the sentences to run concurrently. It is the sentence under A.R.S. § 13–249(B) that is challenged. Appellant urges that A.R.S. § 13–249(A) and (B) must be read together to limit the sentence of first offenders convicted thereunder to a range of 5 to 10 years. The statute in question states, as amended in 1967:

"§ 13–249. Assault with deadly weapon or force; punishment

"A. A person who commits an assault upon the person of another with a deadly weapon or instrument, or by any means or force likely to produce great bodily injury, shall be punished by imprisonment in the state prison for not less than one nor more than ten years, by a fine not exceeding five thousand dollars, or both.

"B. A crime as prescribed by the terms of subsection A, committed by a person armed with a gun or deadly weapon, is punishable by imprisonment in the state prison, for the first offense, for not less than five years, for a second offense, not less than ten years, for a third or subsequent offense, not less than twenty years nor more than life imprisonment, and in no case, except for first offense, shall the person convicted be eligible for commutation of sentence. As amended Laws 1967, Ch. 62, § 3."

Subsection (B) of the foregoing statute was added by the Legislature in 1967 for the purpose of increasing punishment for one who commits an assault while armed with a deadly weapon of the type like a gun which has the potential of inflicting death, *State v. Herkshan,* 105 Ariz. 394, 465 P.2d 587 (1970); *State v. Church,* 109 Ariz. 39, 504 P.2d 940 (1973). The court in the *Church* case, *supra,* held that the statute was unambiguous and constitutional, and upheld a sentence under Subsection (B) of 35 to 50 years. Although not specifically mentioning the statutory construction issue raised by appellant in the instant case (that A.R.S. § 13–249(A) requires a 10-year maximum for first offenders), our courts have uniformly interpreted Subsection (B) to allow a sentence of from 5 years to life imprisonment for assault with a deadly weapon (a gun) under A.R.S. § 13–249(B). See *State v. Smith,* 107 Ariz. 218, 484 P.2d 1049 (1971)

(sentence of 15 years to life); *State v. Marin,* 107 Ariz. 580, 490 P.2d 1170 (1971) (sentence of 10 to 20 years); and *State v. Church, supra* (sentence of 35 to 50 years). We hold that this is a correct interpretation of A.R.S. § 13–249, and that the sentence of appellant was within the statutory limits.

Appellant also attacks his sentence as being an abuse of the trial court's discretion. The sentence is within the statutory limits and will not be superseded absent a clear showing of abuse of discretion. *State v. Lerch,* 107 Ariz. 529, 490 P. 2d 1 (1971). Our review of the record indicates that the trial judge considered all relevant matters, including the testimony of doctors and psychiatrists submitted by the appellant, the nature and seriousness of the offense, appellant's family and background, and the objectives to be sought in sentencing. We find no abuse of discretion.

Affirmed.

OGG, P. J., and HAIRE, Chief Judge, Division 1, concur.