624 P.2d 828

**STATE of Arizona, Appellee,**

v.

**Randy GREENAWALT, Appellant.**

**No. 4616.**

Supreme Court of Arizona,
In Banc.

Jan. 23, 1981.

Rehearing Denied March 3, 1981.

**154**

Robert K. Corbin, Atty. Gen., Phoenix by Bruce M. Ferg, Asst. Atty. Gen., Tucson, for appellee.

Robert C. Brown, Casa Grande, for appellant.

STRUCKMEYER, Chief Justice.

This is an appeal by Randy Greenawalt from judgments of guilty to four counts of murder in the first degree, two counts of armed robbery, three counts of kidnapping, and one count of theft of a motor vehicle and from the sentences of death on the murder convictions. Affirmed.

A brief statement of the facts supporting the convictions for murder will be given at this point. Other facts necessary for an understanding of the many claimed errors will be set forth as the occasion demands.

On Sunday, July 30, 1978, appellant and Gary Tison were imprisoned in the Arizona State Prison at Florence, Arizona, serving lengthy sentences for murder. On that day, they escaped from the Arizona State Prison Trusty Annex. They were aided in their escape by Tison's three sons who were visiting the prison. Appellant actively participated in the escape, having access to the trusty annex control center and receiving and using weapons provided by Tison's sons to compel the cooperation of guards and prison visitors. Appellant and the four Tisons left the prison driving a green Ford sedan. A short time later, they transferred to a Lincoln Continental. This vehicle was later found disabled in Yuma County, Arizona, near Quartzsite.

On August 6, 1978, the bodies of John Lyons, his wife, Donnelda Lyons, and his twenty-two-month-old son, Christopher, were found in or near the Lincoln Continental automobile. Five days later, on August 11, 1978, the body of Theresa Tyson, a niece of the Lyonses, was found in a wash approximately one-fifth of a mile west of the Lincoln Continental. The remains of the Lyonses' small dog were found close to Theresa's body.

John Lyons was the the owner of a late model Mazda automobile. It was subsequently found in a forested area in Coconino County near Flagstaff, Arizona, where it was partially buried and covered with pine branches, abandoned when the Tisons and Greenawalt obtained a four-wheel drive truck in Flagstaff.

In the early morning of August 11, 1978, appellant, together with Gary Tison and his three sons, ran through a roadblock in Pinal

County, Arizona. At that time they were traveling in a stolen Ford van with a Texas license. At a second roadblock, the van was forced off the road and stopped. Donald Tison, a son of Gary Tison, was found shot and unconscious in the driver's seat. Ricky and Raymond Tison, two other sons of Gary Tison, together with appellant, fled into the desert but were captured. Gary Tison escaped. His body was found several days later where he had died from exposure on the desert.

Appellant assigns twenty-three errors on appeal. It is first urged that the trial court erred in refusing to appoint an expert to conduct a public opinion survey. The purpose of the requested survey was to determine the extent to which pretrial publicity had permeated the community, thereby supplying the basis of a motion for change of venue by showing that prejudicial pretrial publicity would have the probable effect of denying appellant a fair trial.

A.R.S. § 13–1673(B) (now § 13–4013(B)) specifically provides for court-appointed experts in capital cases in this language:

"When a person is charged with a capital offense the court * * * shall upon application of the defendant and a showing that the defendant is financially unable to pay for such services, appoint such investigators and expert witnesses as are reasonably necessary adequately to present his defense at trial * * *."

The question whether an expert can properly be appointed, pursuant to A.R.S. § 13–1673(B), to conduct a public opinion poll for the purpose of substantiating a claim that prejudicial pretrial publicity necessitates a change of venue was answered by this Court in *State v. Smith*, 123 Ariz. 231, 599 P.2d 187 (1979). We held:

"Jury selection and proceedings for change of venue are not matters having a bearing on the ultimate question of defendant's guilt or innocence and therefore, are not contemplated by the statute's requirement of necessity 'to present his defense at trial * * *'."

The trial court correctly denied appellant's request to have an expert appointed to conduct a public opinion survey.

Appellant urges that the court erred by imposing a limitation on his use of a court-appointed investigator to areas previously presented to and approved by the court. The court ordered that an investigator be appointed from time to time, based upon counsel's in camera representations as to the necessity of investigations, and further ordered:

"* * * if the defendants wish to have any particular area investigated, then the Court will require that in each instance, counsel advise the Court what they wish to have investigated and why it appears to them to be material." (Omnibus Hearing, September 12, 1978)

It is argued that the trial judge did not need to exercise such personal control over the investigatory activities of counsel and that such control had a "definitely chilling effect upon the conduct of the case."

In *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977), this Court found that the trial court did not err in refusing to allow the court-appointed expert to conduct a questionable experiment. There we set forth the guidelines to be used by the trial court in effecting A.R.S. § 13–1673(B) as well as the scope of review of such actions on appeal:

"A.R.S. § 13–1673(B) is not to be construed as mandating, in every case, an appointment of investigators or experts, nor the expenditure of public money for their use, merely upon application. There must be a finding, by the trial court, (1) that the defendant is unable to pay for such services himself and (2) that the appointment and expenditure is reasonably necessary to present an adequate defense. This determination * * * rests in the sound discretion of the trial court. In the absence of a showing that the determination was an abuse of that discretion, it will not be disturbed on appeal." 114 Ariz. at 540–541, 562 P.2d 704.

The determination of what expenditures are reasonably necessary to enable the defendant to present an adequate defense is

within the sound discretion of the trial court. The requirement that counsel indicate what was to be investigated and why it was believed to be material was not only reasonable but required in order for the court to determine that the expenditure sought was reasonably necessary to enable defendant to present an adequate defense. Appellant made no showing, and our review of the record does not reveal any instance in which the court either denied such a request for an investigator or refused a requested area of investigation presented to the court pursuant to the order.

Appellant's assertion that the disparity between the State's resources and the refusal of the court to appoint an investigator without the prior approval of the court "would seem to be a clear denial of Due Process under the Fifth and Fourteenth Amendments" was also addressed and answered in *State v. Knapp*, supra, wherein we quoted, approved, and adopted the language of the Indiana Supreme Court:

"* * * when the court is allocating state funds for the defense of a defendant, it is rational for the court to use discretion in granting or denying the defendant's requests * * * Within the primary goal of the judicial process, which is due process of law for each defendant the court may determine which expenses are probably needless, wasteful or extravagant. *Magley v. State*, [263 Ind. 618], 335 N.E.2d 811, 816 (1975)."

We conclude the court imposed reasonable limits in order to prevent needless, wasteful or extravagant expenses. Appellant was not denied due process of law and no error was committed.

Appellant urges that the trial court erred in refusing to suppress his statements allegedly obtained by law enforcement officers in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Sixth Amendment right to counsel. The determination of this question requires an enlargement on the facts of the case.

In the very early morning hours (approximately 3:00 a. m.) of August 11, 1978, ap-

pellant and the Tisons, traveling in a late model van, ran a roadblock, fired on the officers manning the roadblock, fired on officers pursuing the van in a high-speed chase, ran through a second roadblock, ran off the highway, and, upon the vehicle becoming disabled, with the exception of Donald Tison, fled on foot into the surrounding desert. Donald Tison was found lying across the front seat of the van, unconscious from a head wound. Subsequently, aided by aerial flares and helicopter search lights, police officers found appellant and Raymond and Ricky Tison lying in the desert at varying distances from the vehicle. The three were taken into custody, disarmed, stripped, handcuffed, shackled, and placed in the bed of a pickup truck while the search continued for Gary Tison.

At daybreak, the pickup truck was moved to a more secured location and the suspects were placed in separate vehicles. Harold Cardwell, a prison official, guarded appellant in the truck. Cardwell gave appellant *Miranda* warnings and asked if he had any statements to make. Appellant at that time asked for an attorney. Appellant was later moved to the back seat of Cardwell's state-owned car. While in Cardwell's car, interviews were attempted by representatives from three different law enforcement agencies: Pinal County Sheriff's Office (Deputies Solis, Harwell and Martinez), Arizona State Prison officials (MacDougall, Cary and Burd), and Department of Public Safety officers (Sanchez and Greig). Two of the agencies, the Pinal County Sheriff's Office and the State Department of Public Safety, conducted interviews using a team approach. Both interviews were brief and were terminated by appellant exercising his *Miranda* rights. There is some indication that Deputy Solis of Pinal County continued to talk with Greenawalt after he had asserted his rights; however, the conversation concerned whether Greenawalt had an attorney or needed to have one appointed. The interviews conducted by the prison officials, MacDougall and Burd, are somewhat confusing as to the sequence of occurrence and who was present. Both sides agree

that appellant made a statement to both MacDougall (either alone or with Cary) and Burd in separate interviews. All interviewing at the scene of arrest ceased at approximately 9:25 a. m., according to Officer Sanchez' testimony.

The State, although assertedly having obtained three statements from appellant (two at the scene of arrest and one later at the Pinal County Jail), introduced and used at appellant's trial only the statement made in the Pinal County Jail. Since the two statements obtained at the scene of the arrest were not used to incriminate appellant, we need not inquire as to the use of procedural safeguards in obtaining those statements.

"the prosecution may not *use* statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682 at 1688, 64 L.Ed.2d 297 (1980). (Emphasis added.)

Appellant was taken to the Pinal County Jail at about 11:15 a. m., where he was examined by a doctor and talked with an attorney for approximately fifteen minutes through a window in a cell. At no time after appellant talked with his attorney did he again request an attorney or in any way indicate a desire to have an attorney present during questioning.

Lt. Tom Brawley, of the Coconino County Sheriff's Office, acting as Supervisor of the Arizona Coordinator Investigative Team (created for the specific purpose of investigating the Greenawalt-Tison matter), interviewed appellant in his cell shortly before 2:00 p. m. It was during this interview, more than four hours after the last interview at the scene, and after appellant had seen a doctor, a lawyer, and had rested, that he had made the third incriminating statement.

The third statement was supported by the testimony on direct examination of Lt. Brawley at the trial, who testified:

"Q. After he told you that he had some things he wanted to clear up what was the next thing that occurred?

A. I then asked him what he wanted to clear up.

Q. What did he tell you at that time?

A. He told me that he wanted to clear up the news media stories of Theresa Tyson.

Q. What happened next?

A. I asked him what he meant and he replied that, 'We didn't kidnap the girl, nor was she sexually molested.'

Q. What was the next statement made?

A. I then asked him if she hadn't been kidnapped where was she.

Q. Did he respond to that question?

A. Yes, he did.

Q. What was his response?

A. His response was that she should be there with the rest of the bodies.

Q. And what was next said?

A. I told him that her body had not been found or she hadn't been found and he said, 'Well, we left her there.'

Q. Were any further statements made?

A. Yes.

Q. What was made at that time?

A. He made a statement that she has—or I made a statement that the Yuma authorities have been unable to locate her and he replied, 'Well just look around because she has to be there.' I then asked him why did she have to be there, was she shot. And he replied, 'You goddamn right she was shot.'

Q. Was there any further conversation after that, Tom?

A. Yes.

Q. Did that concern other matters?

A. Yes, it did.

Q. How long did the conversation continue after that?

A. The total conversation was probably 20, 25 minutes.

Q. During this 20 or 25 minutes that you were there did you threaten Mr. Greenawalt in any way?

A. No.

Q. Did you make any promises to him at all?

A. No, I didn't.

Q. And did you abuse him in any way?

A. No.

Q. How would you describe your manner and your demeanor throughout this period?

A. It was as friendly as possible.

Q. During this period of time did Mr. Greenawalt have any complaints?

A. His only complaint was his eyesight and not having his glasses.

MR. IRWIN: No further questions."

There can be no question but that (1) appellant was advised of his constitutional rights pursuant to *Miranda v. Arizona,* supra, (2) that appellant requested counsel, and (3) that questioning by various officers from various agencies did not cease upon appellant's initial request for counsel. The issue therefore is whether appellant, after first asserting his right to counsel, subsequently waived the right.

 It is well settled that a constitutional right once asserted can subsequently be waived; however, the state has a heavy burden to show such waiver once the right has been asserted. The United States Supreme Court in *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), held that a waiver of *Miranda* rights need not be explicit but may be inferred from the actions and words of a person interrogated.

"[Quoting from *Miranda v. Arizona*] 'If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege *against self-incrimination and his right to retained or appointed counsel.'* 384 U.S. at 475, 86 S.Ct. at 1628."

And see *Tague v. Louisiana,* 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980).

This Court has held:

"Where a suspect has asserted his right to counsel, that right may later be waived, but establishing such a waiver requires proof of an intentional abandonment or relinquishment of a known right or privilege. *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). An express refusal of counsel is not a prerequisite to a valid waiver. *State v. Gholson,* 112 Ariz. 545, 544 P.2d 654 (1976); *State v. Jenkins,* 111 Ariz. 13, 522 P.2d 1090 (1974). Thus, the answering of questions after the giving of a proper '*Miranda*' warning constitutes a waiver by conduct. *State ex rel. Berger v. Superior Court,* 109 Ariz. 506, 513 P.2d 935 (1973), cert. denied sub nom. *Pate v. Arizona,* 414 U.S. 1145, 94 S.Ct. 899, 39 L.Ed.2d 101 (1974); *State v. Knapp,* 114 Ariz. 531, 562 P.2d 704 (1977), cert. denied sub nom. *Knapp v. Arizona,* [435] U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978); *State v. Pineda,* 110 Ariz. 342, 519 P.2d 41 (1974)." *State v. McGinty,* 120 Ariz. 162, 164, 584 P.2d 1153 (1978); see also *State v. Grange,* 25 Ariz.App. 290, 543 P.2d 128 (1975).

The trial court's denial of the motion to suppress was correct. That appellant knew and understood his constitutional rights to remain silent and to have an attorney present during questioning is evidenced by his exercise of those rights. Further, appellant through intelligent exercise of his rights controlled all questioning by selectively choosing which officers with whom he would speak. (Burd, MacDougall and Brawley were all prior acquaintances.) He controlled the questioning by responding only to the specific questions he wanted to answer and refusing to respond to others. Lt. Brawley also testified in his deposition of October 31, 1978:

"Q. After this initial discussion about the subject of the body of Theresa Tyson, did you get into other or attempt to get into other areas with him?

A. Yes. I attempted to and I would ask him a question about some phase of the investigation and he said that he didn't want to reply to that and I said

fine. He said, 'I told you I will talk about some things, not others.' I said, 'Fine. If I ask you something you don't want to talk about tell me.' I asked him several things he didn't want to talk about so I didn't pursue them."

In response to defense counsel's questioning, Lt. Brawley continued:

"Q. Specifically, Mr. Greenawalt would only talk to you about Theresa Tyson, is that correct?

A. He wanted to talk to me about Theresa Tyson, which he did, and then he made one comment pertaining to the Judges [other believed victims] and that was it.

Q. And you, yourself, were never told by anyone that Mr. Greenawalt had previously requested an attorney?

A. He told me, he, himself, told me that he had an attorney, but he still wanted to talk to me about certain things."

Further, Warden Burd's account also reflects that appellant exercised the same degree of control over questioning which occurred at the scene of the arrest. He testified at the suppression hearing:

"Q. And from what you said, the first question you asked him, that you remember, is where was the Tyson girl?

A. Yes, Sir.

\* \* \* \* \* \*

Q. Did he have any reluctance about answering that question?

A. No, to the best of my memory, he answered right off. Like we should have known, or he implied this, you know.

Q. Then, you asked—what was the next question you asked him?

A. I asked him where Gary—if Gary was actually in the van, you know.

Q. Did he answer that question?

A. Yes, he said he definitely was in the van and he took off with the rest of them \* \* \*

Q. And, what was the next question you asked him?

A. And, then, I asked him about the owners of the van, where they were at.

Q. What did he say at that point?

A. He said he didn't want to answer that until he had an opportunity to talk to an attorney.

Q. What did you do at that point?

A. I left him."

Appellant argues that his waiver of his rights was not voluntary. As to this, the record is replete with testimony that appellant was never threatened and there were no promises of leniency. Appellant, himself, testified that Warden Burd "was very polite." He also testified that his reasons for choosing to speak to Warden Burd were (1) he had known him quite awhile, (2) to get rid of him, and (3) to clear up misunderstandings. At a hearing on appellant's motion to suppress, he took the stand and testified:

"Q. Mr. MacDougall and Mr. Burd. Did you answer some of their questions?

A. I believe so, yes.

Q. What was your reason for doing this, Randy?

A. Mr. Burd, I have known him for quite awhile, and, you know, he just kept asking me the questions, you know, little side line questions. I finally answered one of Mr. Burd's questions.

Q. What was your reason for doing this?

A. Oh, probably a combination of reasons.

Q. Can you express those reasons?

A. Not accurately, no.

Q. Do you know what they are?

A. Yes, one of them, one of the reasons was to try and, you know, and get rid of him, get him off my back.

Q. When you were speaking with Warden Burd, did he threaten you in any way?

A. No, he was very polite.

Q. Did he make you any promises of any sort?

A. No.

\* \* \* \* \* \*

Q. Without going into the actual statements you gave him, can you express

the reasons that made a difference in your choosing to speak with Warden Burd?

A. To clear up misunderstandings.

Q. You felt there was some misunderstanding, then?

A. Yes.

Q. And you wished to clear up that misunderstanding?

A. In a way, yes.

Q. Did you feel at that time there had been some inaccurate reports in the newspapers?

A. Yes, sir.

Q. You felt that some of the public comments in the press and the newspapers were inaccurate and misleading?

A. Quite a bit.

Q. And, this was one of the other reasons that you thought you should explain this to Warden Burd?

A. Yes, that plus the fact that I knew him, plus he told me it wouldn't go any farther.

\* \* \* \* \* \*

Q. Mr. Greenawalt, I think you indicated a minute ago in my questioning that you wanted to clear something up with the Warden and this was the reason that you spoke with him, or one of the reasons that you spoke with him.

Does this have to do with accounts that had been published in newspapers or on the radio which you felt had done you some injustice?

A. I don't know about doing—yes, that is correct. Because they were incorrect.

Q. And you wanted to clear the record, so to speak?

A. I don't know about clearing the record.

Q. Set the record straight?

A. Something to that effect."

■ Once the accused has properly challenged the State's evidence, the State has the burden to show, by a preponderance of the evidence, the legality of the acquisition of any challenged evidence. The court's findings, pursuant to a Rule 16.2, Rules of Criminal Procedure, 17 A.R.S., motion to suppress, as to the lawfulness of the State's acquisition of evidence will be upheld on appeal if supported by adequate evidence absent clear and manifest error.

By stipulation of counsel, appellant's motion to suppress was heard and decided by a Pinal County Superior Court Judge rather than the Yuma County judge assigned to the case.

■ The evidence presented, viewed most favorably to affirming the trial court, indicates: (1) appellant received, understood and asserted his constitutional rights; (2) that when appellant chose to speak, he did so only to those officers with whom he was previously acquainted; (3) and even then, was very selective as to what questions he would answer, thereby maintaining complete control of the interview; and (4) that the purpose or reason for discussing any area with any officer was appellant's desire to correct the inaccurate and misleading news reports relative to the Yuma County incident and specifically the whereabouts of one of the victims, Theresa Tyson; (5) that no promises, threats or coercion were used to obtain the statements; (6) that although appellant was successively interviewed, the interviews were conducted by investigators from different agencies, each conducting its own investigation, and were of very brief duration; and (7) when appellant indicated to the interviewer that he did not want to discuss the matter further, or that he wanted an attorney present, questioning by that interviewer ceased and his assertion of rights was respected and honored by that interviewer.

The trial court, following the hearing at which appellant testified as stated supra, found:

"* * * * the statements made by Randy Greenawalt on August 11, 1978 to law enforcement personnel, both at the scene of the arrest and at the Pinal County Jail, were made freely and voluntarily, therefore the Motion to Suppress is denied."

We hold the trial court did not err in this respect.

For his fourth assignment of error, appellant urges that the trial court erred in refusing to grant his pretrial publicity motions. Specifically, he points to (1) his motion to continue, (2) his request to individually voir dire jurors, (3) his motion to have the jury sequestered, and (4) his motion to change either the venue or the venire.

■ We note that the determination of these, like most pretrial motions, rests within the sound discretion of the trial court, and as such will not be disturbed on appeal absent a clear showing of abuse of discretion and resulting prejudice to defendant.

"A motion for continuance is not granted as a matter of right. The matter is solely within the sound discretion of the trial judge whose decision will not be disturbed unless there is a clear abuse of discretion, and unless denial of the motion is shown to be prejudicial to the defendant. *State v. Richie*, 110 Ariz. 590, 521 P.2d 1136 (1974); *State v. Benge*, 110 Ariz. 473, 520 P.2d 843 (1974); *State v. Guthrie*, 108 Ariz. 280, 496 P.2d 580 (1972)." *State v. Jackson*, 112 Ariz. 149, 154, 539 P.2d 906 (1975).

See also, *State v. Schmid*, 107 Ariz. 191, 484 P.2d 187 (1971).

Appellant's other motions are governed by the same standard; for abuse of discretion with resulting prejudice, see *State v. Schmid*, supra (change of venue); *State v. Richmond*, 112 Ariz. 228, 540 P.2d 700 (1975) (change of venue); *State v. Melendez*, 121 Ariz. 1, 588 P.2d 294 (1978) (scope of voir dire); *State v. Rose*, 121 Ariz. 131, 589 P.2d 5 (1978) (extent of voir dire); Rule 18.5, Arizona Rules of Criminal Procedure, 17 A.R.S. ("the court *may* permit counsel to examine an individual juror" (emphasis added)); *State v. Lippard*, 26 Ariz.App. 417, 549 P.2d 197 (1976); Rule 19.4, Rules of Criminal Procedure, 17 A.R.S. ("The court in its discretion *may* permit jurors to separate or, on motion of any party, *may* require them to be sequestered * * * " (emphasis added)).

With this standard in mind, we examine each specifically asserted error for abuse of discretion.

■ Appellant contends that "[t]he court did not permit the matter to be continued sufficiently to allow the publicity to subside, and granted continuances only long enough to permit counsel to prepare for trial." There can be no question but that during August and September of 1978 the crimes with which appellant was charged, as well as his subsequent capture by law enforcement officers, were top news items which received extensive coverage. Appellant's trial, which resulted in his conviction began February 9, 1979, almost six months after his capture. The record not only does not indicate that the extensive news coverage continued throughout the six-month period between appellant's capture and his trial, but appellant's counsel affirmatively asserted on November 14, 1978 that the publicity had died down to manageable proportions and that the case was becoming a "murder case and not a cause celebre." On this record, there is no evidence that the trial court abused its discretion.

Appellant asserts that "[t]he court did not permit individual voir dire of the jurors in order to allow counsel to probe for the effects of the publicity." Contrary to what appellant asserts, the trial judge did permit counsel to question several jurors individually, out of the hearing of other jurors, following the court's voir dire. Defense counsel questioned thirteen jurors individually and separately regarding the publicity generally and specifically on what they knew or could recall about statements allegedly made by the Tison brothers.

Rule 18.5, Arizona Rules of Criminal Procedure, 17 A.R.S., governs the procedures for selecting a jury. It provides:

"d. Voir Dire Examination. *The court shall* conduct the voir dire examination, putting to the jurors all appropriate questions requested by counsel. *The court may* in its discretion examine one or more jurors apart from the other jurors.

If good cause appears, the court may permit counsel to examine an individual juror.

e. Scope of Examination. The examination of prospective jurors shall be limited to inquiries directed to bases for challenge for cause or to information to enable the parties to exercise intelligently their peremptory challenges." (Emphasis added.)

The rule clearly puts the burden of voir dire on the court; however, for good cause appearing, the court may permit, in its discretion, counsel to examine an individual juror. The trial judge examined the panel from questions prepared by counsel, permitted individual voir dire by respective counsel as appropriate due to the affirmative answers, and, further, permitted defense counsel to individually question some thirteen jurors separate and apart from all other jurors.

■ In reviewing the questions posed to the panel by the trial judge, we find that all areas of pretrial publicity, prior knowledge of the appellant's background, and the alleged statements of the Tison brothers were sufficiently inquired into to give counsel adequate information to enable them to intelligently exercise their challenges. We find no error in refusing to allow defense counsel to individually and separately question every member of the panel.

Appellant complains of the failure to sequester the jury. Rule 19.4, Arizona Rules of Criminal Procedure, provides:

"The court in its discretion may permit jurors to separate or, on motion of any party may require them to be sequestered * * *."

■ He argues it was error for the trial court to refuse to sequester the jury and to allow them to return to the community "saturated" with trial publicity every night. The trial court admonished the jurors:

"Do not expose yourselves to any news accounts of the trial and don't go to anyplace mentioned in the evidence for the purpose of making a personal inspection of it. Regarding news accounts of the trial I am sure there will be some. Tell your family you are not to be exposed to any of those accounts. Don't read any newspaper accounts and tell them not to permit you to read any news accounts. If necessary, have them cut those accounts out of the paper if you want to read the paper.

So far as television sets are concerned just don't be in the room when the news is on. Don't listen to it, don't turn on the radio for that purpose. And if you find yourself in that position you can either turn it off or get out of the room. Let your family know these are the ground rules by which you must abide during the course of the trial."

We think this is sufficient, absent a showing of juror misconduct or disobedience to the court's admonitions. We will not disturb the trial court's discretion in this matter on appeal.

Appellant complains that he was denied a change of venue based on pretrial publicity. His burden is set forth in Rule 10.3(b), Arizona Rules of Criminal Procedure, 17 A.R.S.:

"Whenever the grounds for change of place of trial are based on pretrial publicity, the moving party shall be required to prove that the dissemination of the prejudicial material will probably result in the party being deprived of a fair trial."

■ Appellant has filed numerous newspaper articles relative to the prison escape, the discovery of the victims' bodies, the shootout capture at the roadblock, and the ensuing judicial proceedings. Such events are clearly newsworthy and will almost always generate extensive coverage due to the very nature of the activities. However, it is the "prejudice" of the publicity, and not the "extensiveness" of the publicity, with which we are concerned. In *State v. Schmid*, 109 Ariz. 349, 353, 509 P.2d 619 (1973), this court clearly placed the burden of proving publicity-caused jury prejudice on the defendant:

"We hold that without a showing of such outrageous circumstances as *Sheppard* [384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)] or *Estes* [381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), reh. den. 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965)], where an accused is subjected to

widespread publicity prior to and during the trial, it is not enough to allege that there was extensive press coverage of the trial or the events preceding it, unless jury prejudice can be proved."

An examination of the jurors, through voir dire process, is an effective means by which to determine the effects or influence of pretrial publicity on the jurors. As discussed previously, voir dire in this case was extensive with a particular emphasis on inquiry into the exposure to and effects of pretrial publicity.

A defendant, pursuant to fundamental fairness, due process requirements of the federal and state constitutions, is entitled to be tried by a fair and impartial jury. U.S. Constitution, Fifth and Fourteenth Amendments; Art. II, Sec. 4, Arizona Constitution; *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Therefore, our inquiry is whether the publicity, extensive or otherwise, was prejudicial to the point of having the probable effect of precluding a trial by fair and impartial jurors. Rule 10.3(b), Rules of Criminal Procedure, 17 A.R.S.

"The fact that all of the empanelled jurors had some degree of knowledge of the facts of this case, does not, in and of itself, demonstrate such prejudice as would necessitate a change of venue * *." *State v. Schmid*, 107 Ariz. 191, 193, 484 P.2d 187 (1971).

This case, like *Schmid*, supra, is one which the entire panel had, through pretrial publicity, acquired some degree of knowledge of the facts of the case; but, as the record shows, only 41 potential jurors had to be called to obtain a panel of 34 (20 challenges, 2 alternates, and jury of 12), of which only four were excused by the court for the reason that they could not set aside a previously formed opinion. Additional indicia of lack of juror prejudice is indicated by the fact that in the jury selection process for the initial trial (which terminated in a mistrial) only 39 had to be called to qualify a panel of 34.

Finally, we note what the trial judge said in denying the defense motion to have public opinion poll taken:

"I think the best way to determine the existence of whether your case can be fairly tried here would be through a voir dire process and failing that, then, of course, the question that you seek can be raised once again.

The newspaper accounts to this point, the factual reporting, that is, has not struck me, and those accounts which I read in both the local newspaper and the Arizona Republic as being anything but a factual rendition; albeit, inaccurate. We may find that out later, but I don't think the articles that I have read have been designed to inflame the passions of the public * * *."

■ Appellant has failed to carry his burden of showing that the extensive pretrial publicity was prejudicial or would probably result in the denial of a fair trial. The trial court denied the motion for change of venue and we will not disturb his ruling on the present record.

Appellant asserts he did not receive the type of fair trial mandated by the due process clause of the Fifth and Fourteenth Amendments of the United States Constitution due to the publicity in this matter. He points to what he calls the "unchecked and irresponsible journalism" which created the type of carnival-like atmosphere which the court found present and condemned in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In addition, counsel relies on pretrial publicity matters which this Court has previously held should not occur, and which may result in reversal. Specifically, this Court in *State v. Schmid*, supra, suggested that in order to preserve the rights of the accused, the news media restrict its coverage in several particulars, including:

"(1) the character, reputation, or prior criminal record (including arrests, indictment, or other criminal charges) of the accused;

 * * * * * *

(3) the existence or contents of any confession, admission, or statement given by the accused, * * *

 * * * * * *

(5) the identity, testimony or credibility of prospective witnesses; * * *."
109 Ariz. at 353–354, 509 P.2d 619.

The clear concern of the court in *Schmid* was the effects of such publicity upon the accused's right to be tried by a fair and impartial jury. Although publicity of the nature specified in *Schmid* may create such prejudice as would preclude a fair trial, this will not be presumed unless the circumstances are extreme.

Prejudice, sufficient to preclude a fair trial, has been presumed from the outrageous circumstances in which the trials were conducted in *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Sheppard v. Maxwell*, supra. In *Murphy v. Florida*, supra, the Court explained that in these cases, *Rideau, Estes, Sheppard*, the presumption of prejudice was based on the fact that:

> "The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. *[These cases] cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process."* 421 U.S. at 799, 95 S.Ct. at 2036, 44 L.Ed.2d at 594.

The proceedings involved in the three cases wherein prejudice was presumed lacked the solemnity and sobriety appropriate to a judicial proceeding, and, instead there developed a carnival-like atmosphere. Such was not present in the case before us. The trial was covered by the press, including the use of television cameras on the lawn of the courthouse. They were prohibited inside. Persons attending the trial, including jurors, were searched and the jury was not sequestered. But we do not think this even remotely approaches the outrageous circumstances present in those cases in which prejudice has been presumed.

Since we do not find a presumption of prejudice, appellant must show the actual presence of such prejudice that a fair trial was precluded.

Appellant relies heavily on the extensive *pretrial* publicity to establish such prejudice. It is pointed out that the media printed the prior criminal record of appellant "ad nauseum," and published the alleged confessions of codefendants accusing appellant of the murders, thereby completely ignoring the *Schmid* criteria. While the *Schmid* criteria are clearly an indication of the factors this Court may look to to determine whether the publicity has prejudiced the accused's right to a fair trial, they are not ironclad grounds for automatic error.

The court on voir dire placed particular emphasis on the two noted areas of publicity.

> "THE COURT: Very well. Do you know anything of or have you read or heard anything about the life and history of Randy Greenawalt, the defendant, as it existed before July 1978? * * * "

There were no affirmative responses to this inquiry. As to the alleged statements made by the codefendants, the court, early in voir dire asked:

> "All of you have heard or read about the case. More specifically have any of you, do any of you recall having heard or read anything about statements attributed to the defendant or co-defendants, Ricky Tison or Raymond Tison? Do any of you recall having heard anything about the statements they may have made?"

To which fifteen members of the panel responded affirmatively. Subsequently, close to the end of the voir dire, the court again asked:

> "Finally, let me ask again, I think I asked this question previously, but I may have overlooked doing so, have any of you read or heard about any statement attributed to either the defendant or to co-defendants Ricky and Raymond Tison concerning this case?"

At this time, ten members of the panel responded affirmatively.

It should be noted that between the first inquiry and the second, four jurors had been excused by the court and four new panelists called. Of the 19 individuals acknowledging having heard or read about the statements, four were excused by the court for having a strong opinion, and 13 were individually and separately questioned on voir dire by defense counsel. Of 13 individually examined, defense counsel allowed three to remain on the panel without being peremptorily challenged. Although defense counsel did challenge one for cause, upon denial of the challenge counsel did not peremptorily challenge the particular juror. The jury which convicted appellant contained five members who acknowledged prior knowledge, three of whom had been individually examined on voir dire, and all of whom the court decided could set aside what information they remembered and decide the case fairly and impartially.

We do not think that on this record there was a sufficient showing that the prior publicity, both as to the statements allegedly made by the codefendant and the prior criminal record of the defendant, tainted the jury's verdict. The language of the United States Supreme Court in *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), is appropriate here:

"Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under Murphy, *extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair.* Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a 'trial atmosphere ... utterly corrupted by press coverage.' *Murphy v. Florida*, supra, * * *." 432 U.S. at 303, 97 S.Ct. at 2303, 53 L.Ed.2d at 362. (Emphasis added.)

In reviewing the entire record, we are satisfied that the trial judge, with the cooperation of the parties and members of the press, conducted this trial in a fair and impartial manner. The proceedings were conducted in appropriately solemn and serious judicial fashion, accompanied by a full and sober realization of all that was involved. We find no violation of the Arizona Constitution, nor of the federal constitutional requirements of due process.

For his sixth error on appeal, appellant argues the trial court erred in refusing to grant his motion in limine and the overruling of his objections at trial regarding the exclusion of evidence of events occurring before and after the killing of the Lyons family and Theresa Tyson. Specifically, appellant objects to the testimony relative to the prison escape and to his capture near Casa Grande as being irrelevant and highly prejudicial. He urges that the applicable rule regarding admissibility of separate and distinct crimes is stated in *Dorsey v. State*, 25 Ariz. 139, 143, 213 P. 1011, 1012 (1923):

"The general rule is that, in the prosecution of one accused of a particular offense, evidence showing or tending to show the commission by accused of another crime entirely distinct and independent of that for which he is on trial, * * * is neither relevant nor admissible."

■ While we agree with the statement of the rule, see also *State v. Myers*, 117 Ariz. 79, 570 P.2d 1252 (1977), cert. denied 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978), we fail to find it applicable to the present case for the following reasons. Appellant was charged with murder in the first degree pursuant to A.R.S. § 13–452 (now § 13–1105), which at the time of the offense read:

"A murder which is perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, deliberate or premeditated killing, *or which is commit-*

*ted in avoiding or preventing lawful arrest or effecting an escape from legal custody \* \* \* is murder in the first degree."* (Emphasis added.)

In the present situation we are not dealing with "another crime entirely distinct and independent of that for which [the accused] is on trial" as contemplated in *Dorsey*, or Rule 404(b), Rules of Evidence, 17A A.R.S. To convict under the statute A.R.S. § 13–454 (now § 13–703), the State *must* present evidence sufficient to show that the murders were committed in "avoiding or preventing lawful arrest or effecting an escape from legal custody," or any of the other proscribed acts. Where the accused is charged with first degree murder, based upon the felony-murder statute, which itself requires a showing of another underlying crime or specified conduct *as an element* of the offense charged, evidence of the proscribed conduct cannot be precluded as being irrelevant or prejudicial. Clearly, in such situations the underlying criminal activity is not distinct and independent; rather, it is an integral part of the crime with which appellant was charged. Testimony regarding appellant's escape and flight from the Arizona State Prison, as well as testimony regarding the capture is relevant and admissible to show either that the murders occurred in "effecting an escape", "to avoid or prevent lawful arrest", or both.

Appellant and his companions fled the prison in a green Ford sedan and within a very short time changed to a Lincoln Continental. This vehicle, after being driven some distance, became disabled. It was discarded and abandoned in the desert in Yuma County. Appellant and his companions continued their journey in the late model Mazda registered in the name of the victims, the Lyons family, and it was driven until yet a fourth vehicle was obtained in northern Arizona. Several days later, while in still another vehicle, the group ran the roadblock in Pinal County. In all, they traveled in at least five different vehicles.

The Continental and the Mazda were abandoned in such a manner as to suggest there was an attempt to keep their locations secret, so that the occupants' route and whereabouts would be unknown to the authorities seeking their capture. The Continental was driven some distance off the highway onto a gasline maintenance road and then backed well off the gravel maintenance road into the desert. The vehicle and the remains of the murdered victims were not discovered until August 6, 1978, almost six full days after the murders occurred. The Mazda was driven until a Chevrolet truck was obtained, and it was then abandoned in a forest area south of Flagstaff. The Mazda was discovered by authorities on August 11, 1978, some eight days after appellant and his companions were last seen in the area. It had been painted gray with spray paint, buried to the center of the wheels, and covered with pine boughs.

Testimony of the capture indicated that the vehicle in which appellant was riding ran two roadblocks and the occupants of the van fired on the law enforcement officers manning the roadblocks. Officers on the scene testified that when appellant was taken into custody, he was armed with a rifle and a .357 magnum pistol.

Evidence of the prison escape, repeated changes of vehicles, the means of disposing of the vehicles used, and the circumstances of the apprehension near Casa Grande, including the weapons seized, is relevant and admissible to establish a substantive element of the crime with which appellant is charged—that appellant was effecting an escape from lawful custody and/or was attempting to avoid or prevent lawful arrest. The trial court did not err in admitting evidence of the very acts or circumstances which the applicable statute, A.R.S. § 13–452, specifically itemized as elements of the charge itself. We think the evidence objected to was obviously relevant.

For his seventh issue on appeal, appellant argues that the trial court erred in denying his challenge to the jury panel on the grounds that (1) the size of the panel from which the jury was drawn was somewhat reduced in that four juries had been drawn from the panel within four days, and (2)

that the average age of prospective jurors was "raised" to 45.5 years.

◼ We do not understand that this could possibly be error. An accused has a constitutional right to be tried by a fair and impartial jury, United States Constitution, Amend. VI; Arizona Constitution, Art. 2, § 24, but he is not entitled to be tried by any one particular jury. See *State v. Thompson*, 68 Ariz. 386, 206 P.2d 1037 (1949). Unless the record affirmatively shows that a fair and impartial jury was not secured, the trial court must be affirmed. *State v. Zimmer*, 106 Ariz. 166, 472 P.2d 35 (1970).

In challenging the jury panel, pursuant to Rule 18.4, Rules of Criminal Procedure, 17 A.R.S., the challenger has the burden of showing that the panel's selection constituted or was the result of a "material departure from the requirements of law." Appellant has not shown that the jury was unlawfully empanelled (as required by Rule 18.4) or that the jurors were other than fair and impartial (as required by the Arizona and United States Constitutions).

◼ Appellant alleges that the average age of prospective jurors was "raised" to 45.5 years, but he makes no showing of the average age of all potential jurors or, if a substantial deviation was present, how such a deviation prejudiced him. Unless it can be shown that the average age of the jurors was prejudicial to him, appellant's challenge based on the age of the jurors is without merit. Nor does the fact that the master panel from which appellant's jury was selected had been reduced in number in itself give rise to reversible error without a showing of prejudice. Rule 18.4, Rules of Criminal Procedure, 17 A.R.S. We find this Court's statement in *State v. Miller*, 71 Ariz. 140, 224 P.2d 205 (1950), determinative of appellant's position on appeal:

" * * * When a jury panel has been regularly called, summoned, qualified and sworn, in accordance with [the applicable laws] * * * then such a panel is a legal jury panel. *The mere fact* that the whole jury panel of 175 members, as there were in this one, *is not* again personally sum-

moned through the sheriff and *present when a case goes to trial is not such an irregularity that would disqualify a fair representative group drawn by lot from the panel to try the case.* All that a defendant or party litigant is entitled to is a fair and impartial jury to try his case. In the instant case no claim is made by defendant that he was prejudiced in any way. *He is merely insisting on an assumed technical legal right to have the entire panel present.* We feel the record shows that his rights to a fair and impartial jury have not been invaded and that is all that is due him." 71 Ariz. at 143, 224 P.2d 205. (Emphasis added.)

Appellant was tried by a fair and impartial jury, drawn from a legally constituted panel. We find no error.

Appellant urges as his eighth error on appeal that the trial court erred in refusing to halt the sheriff's "searching" of jurors and spectators and in denying his motion for mistrial based upon such searches. The "searching" of which appellant complains was the subjecting of spectators and, on occasion jurors, to a minimally intrusive "scanning" by an electronic metal detecting device.

◼ The issue of whether a defendant had been denied a fair trial by reason of the security precautions employed throughout the trial has been addressed by the Federal Circuit Court in *United States v. Howell*, 514 F.2d 710 (5th Cir. 1975), *cert. denied*, 429 U.S. 838, 97 S.Ct. 109, 50 L.Ed.2d 105 (1976). There, the court held that the presence of eleven marshals in the courtroom and the practice of passing all persons, including jurors, admitted to the courtroom through two magnometers for the purpose of detecting metal was not unreasonable given the facts known to the court. See also *United States v. Kelly*, 551 F.2d 760, cert. denied 433 U.S. 912, 97 S.Ct. 2981, 53 L.Ed.2d 1097 (8th Cir. 1977); *United States v. Jackson*, 549 F.2d 517 (8th Cir. 1977). Here, the very nature of the crimes with which the defendant was on trial and the knowledge that at the time of the crimes he

was an escapee from the state prison where he had been incarcerated for a prior murder, clearly justified the trial judge's concern for the safety of those present in the courtroom.

The conduct of a trial to a very large extent rests within the sound discretion of the trial judge, who is in the best position to observe what measures need to be taken to insure that there be a fair and impartial trial. Counsel's analogy to the "restraint" cases is ill-founded. The concern here was not entirely with the possibility of appellant's escape or his dangerous nature, but also with the possibility that appellant would be protected against violent reprisals by those who might attempt to administer their own concept of justice. In view of the facts and circumstances known to the trial judge, we find no abuse of discretion.

Next, appellant argues that the trial court erred in admitting into evidence the numerous weapons which were found in the van in which appellant was riding when captured. These weapons, according to appellant, bore no known connection with the Yuma County charges for which the accused was on trial.

■ We disagree. That at the time of his arrest appellant had in his possession and had access to many deadly weapons, clearly substantiates the State's theory that the five people in the van were attempting to avoid being arrested or captured and showed that they were prepared and capable of using the most extreme measures to prevent their future restraint. Evidence is not inadmissible simply because it paints a black picture of a defendant's character or his bent for evil. We find no error.

Appellant next urges that the trial court erred in refusing to give his requested second degree murder instruction. The Court's reason for refusing the requested instruction was stated as:

"Defendant's requested instruction number 12 is refused in that it instructs on second degree murder and the case is being submitted solely on the felony murder rule."

■ In *State v. Valencia*, 121 Ariz. 191, 589 P.2d 434 (1979), this Court considered the propriety of instructing on second degree murder when an accused was charged under the felony-murder statute. In that case, the defendant was charged with first degree murder committed in the perpetration of a robbery. After noting that the trial court should instruct the jury on every degree or grade of offense that is supported by the evidence, we said:

"We have stated that a jury may not be instructed on a lesser degree of murder than first degree where the evidence indicates it was committed in the course of a robbery. *State v. Clayton*, 109 Ariz. [587], 514 P.2d 720 (1973); *State v. Kruchten*, 101 Ariz. 186, 417 P.2d 510 (1966); *State v. Folk*, 78 Ariz. 205, 277 P.2d 1016 (1954)." 121 Ariz. at 198, 589 P.2d 434.

When a case is submitted to the jury solely on a felony-murder theory, the jury may not be instructed on a lesser degree of murder where the evidence indicates it was committed in the perpetration or attempted perpetration of any of the activities enumerated in the first degree murder statute, A.R.S. § 13–452.

■ The evidence in the present case supports only a first degree murder instruction because the murders were committed either in effecting an escape from lawful custody, in preventing or avoiding lawful arrest, or in a robbery while effecting an escape or avoiding an arrest. The trial court properly refused the requested instruction.

Appellant's eleventh assignment of error is that the court below erroneously instructed the jury at the State's request on the theory of conspiracy as a ground of vicarious criminal responsibility.

The Court instructed the jury:

"A conspiracy is an agreement between two or more persons to commit a public offense or crime.

It is not necessary in proving a conspiracy to show a meeting of the alleged conspirators or the making of an express or formal agreement. The formation and existence of a conspiracy may be inferred

from all the circumstances tending to show the common intent and may be proved in the same way as any other fact may be proved, either by direct testimony of the facts or by circumstantial evidence.

The acts and statements of a conspirator when said or done in furtherance of the conspiracy and during its continuance are binding on all participants in the conspiracy.

One may become a member of a conspiracy without full knowledge of all the details of the conspiracy. On the other hand a person who has knowledge of a conspiracy, but happens to act in a way which furthers the object or purpose of the conspiracy does not thereby become a conspirator.

Before you may find a defendant or any other person has become a member of a conspiracy the evidence in the case must show beyond a reasonable doubt that the conspiracy was knowingly formed and that the defendant or other person who is claimed to have been a member wilfully participated in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy.

To act or participate wilfully means to act or to participate voluntarily and intentionally and with specific intent to do something that the law forbids or with specific intent to fail to do something the law requires to be done. That is to say, to act or participate with the bad purpose either to disobey or disregard the law.

So if a defendant or any other person with the understanding of the unlawful character of a plan knowingly encourages, advises, or assists for the purpose of furthering the undertaking or scheme, he thereby becomes a wilful participant conspirator.

One who wilfully joins an existing conspiracy is charged with the same responsibility as if he had been one of the original conspirators or instigators of the conspiracy."

By statute:

"All persons concerned in the commission of a crime * * * whether they direct-ly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission * * * are principals in any crime so committed." A.R.S. § 13–139 (now § 13–301).

Clearly under the State's evidence in the case by force of A.R.S. § 13–139 Greenawalt was concerned in the commission of the crimes and was therefore a principal in the murders of Theresa Tyson and the Lyons family. The evidence showed that Greenawalt just before the escape was in the trusty annex control center at the Arizona State Prison, where he received a shotgun and a pistol from one of Gary Tison's sons; that he gave the pistol to Gary Tison when Gary entered the control center and used the shotgun to threaten the prison guards, compelling them to lie down on the floor. Thereafter, Greenawalt locked the guards and some prison visitors in a storage room and left the prison with Gary Tison and his sons in a green Ford sedan, later found abandoned two miles from the prison. They transferred to a Lincoln Continental which had been given to Gary Tison's sons by an uncle. When the Lincoln was found, appellant's palm print along with finger prints of each of the Tisons were found on it.

A friend of Greenawalt, Kathleen Ehrmentraut, was contacted by Donald Tison on the afternoon of the day following the Lyons murders. She later met Greenawalt at her home about 9:00 p.m. and there was a discussion about their use of her son's truck. The next morning, Greenawalt returned with Donald Tison and told Ehrmentraut to go to town and buy them a vehicle, which she and Donald Tison did, buying a blue, four-wheel-drive Chevrolet pickup. She left appellant at the house to watch her grandchildren. In addition, Ehrmentraut gave Tison and Greenawalt a Winchester rifle and a .357 magnum pistol. That afternoon she bought more that $80.00 worth of ammunition which she gave to appellant later that evening. The Lyonses' Mazda was subsequently found in the same general

area where she gave the ammunition to Greenawalt. His fingerprints along with those of Raymond Tison were found in the Mazda. A person resembling appellant in appearance was later seen in Flagstaff putting gas in the blue Chevrolet pickup. When appellant was captured, he was armed with the pistol and the rifle which had been obtained from Ehrmentraut.

Appellant's statement made to Officer Tom Brawley, as testified to by Brawley, is alone sufficient evidence to tie Greenawalt to the homicides. Greenawalt told him: "We didn't kidnap the girl [the Lyonses' niece], nor was she sexually molested. * * we left her there * * * just look around because she has to be there * * * she was shot."

The conspiracy instruction charged the jury that:

"So if a defendant or any other person with the understanding of the unlawful character of a plan knowingly encourages, advises, or assists for the purpose of furthering the undertaking or scheme, he thereby becomes a wilful participant conspirator."

▮ This is no more than a re-statement of the criminal responsibility found in A.R.S. § 13–139, that is, if appellant encouraged, advised, or assisted the Tisons "for the purpose of furthering the undertaking" he became a "participant conspirator." While the requested instruction involving conspiracy added nothing to the State's theory of responsibility for the murders, under the felony murder statute, A.R.S. § 13–452, neither do we think it misled or confused the jury.

For his twelfth error, appellant urges that the court below erred in refusing to conduct separate hearings for sentencing for capital and non-capital crimes, and, as a result, evidence which was inadmissible under the death penalty statute was considered by the court. We, however, disagree. No error was committed in holding either a single sentencing hearing or in admitting the evidence objected to by appellant.

▮ The Arizona death penalty statute provides for a "separate sentencing hearing," A.R.S. § 13–454(A) (now § 13–703(B)), at which time evidence may be offered by both sides in order to support or controvert the existence of aggravating and/or mitigating circumstances. A.R.S. § 13–454(B) (now § 13–703(C)). The appellant's position is that this statutory provision requires separate hearings on sentencing to be held when there are convictions for capital and non-capital crimes. We hold, however, that the intent of the Legislature in enacting the statute requiring "separate sentencing hearing" was merely to provide for a bifurcated procedure by which sentencing was to be separated from the trial of guilt and that the words have no further purpose.

The appellant next challenges the nature of the evidence which was received in the aggravation/mitigation hearing. The prosecution introduced certified copies of the prior convictions of the appellant from both Arizona and Arkansas which established that Greenawalt had been convicted of first degree murder in both jurisdictions, and of robbery in Arkansas. Further, law enforcement officers were permitted to testify as to the specific factual circumstances of the crimes. Sheriff George Ford of Mississippi County, Arkansas, testified concerning a conversation he had with Greenawalt regarding the manner in which the robbery and killing in Arkansas were committed. According to Sheriff Ford, Greenawalt told him that he had stopped at a rest stop along the highway and, being that he was " * * * broke and needed some money," he had armed himself and decided to rob a truckdriver who had gone into the restroom. Greenawalt went into the restroom and " * * * engaged briefly in a conversation with the decedent * * *. And * * * he went to the stall where Mr. Weber was seated on the commode and demanded that he give him money. * * * And as he stood up he told me he shot him in the head."

The prosecution also had photographs of the scene of the killing in Arizona admitted in evidence. And, finally, Lt. Brawley of the Coconino County Sheriff's Office testi-

fied concerning statements made by Greenawalt in regard to the actual commission of the Arizona crime. According to this officer's account, Greenawalt stated that "* * * he had learned of a good way of obtaining money from truckdrivers," and had then shot and robbed a truckdriver while the victim was asleep in his truck.

■ Appellant interprets our decision in *State v. Lee*, 114 Ariz. 101, 559 P.2d 657 (1976), as precluding the sentencing court from receiving any evidence other than certified copies of prior convictions. Appellant errs in his interpretation of our decision in *State v. Lee*, supra. There, we were concerned with the introduction of evidence of prior convictions as they related to the first aggravating circumstance, A.R.S. § 13–454(E)(1) (now § 13–703(F)(1)). We did not hold that other forms of evidence were not relevant and admissible to the other aggravating circumstances specified in the statute. To illustrate, in *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977), we approved of the procedure in which the victim in a different crime was called as a witness to identify the defendant as the person who had kidnapped him. This form of evidence was offered and received by the sentencing court to establish the existence of the second aggravating circumstance under our death penalty statute, a prior felony conviction involving the use or threat of violence on another person. A.R.S. § 13–454(E)(2) (now § 13–703(F)(2)). The limitation on proof which was adopted in *State v. Lee*, supra, has no application to the second aggravating circumstance. The testimony of the three law enforcement officers concerning the details of the prior crimes of violence which were committed by Greenawalt was properly received in the court below.

Appellant questions whether the admission of the testimony of the nature of the prior crimes at the sentencing hearing violates the statutory limitation on the receipt of evidence found in A.R.S. § 13–454(B). That section provides:

"* * * the admissibility of information relevant to any of the aggravating circumstances * * * shall be governed by the rules governing the admission of evidence at criminal trials."

It is the appellant's view that this evidence was highly prejudicial and irrelevant and, as such, would not have been admissible at a trial.

By Rule 403, Rules of Evidence, 17A A.R.S., relevant evidence will be excluded only if its probative value is substantially outweighed by factors such as the danger of unfair prejudice. Since the testimony of the law enforcement officers about the prior crimes was highly relevant to the determination by the court of whether a crime of violence within the purview of A.R.S. § 13–454(E)(2) had occurred, we hold that the admission of this evidence was proper. The receipt of this testimony serves the basic function of an aggravation/mitigation hearing which is to determine the character and propensities of the defendant so that the punishment imposed will fit both the crime and the offender. *State v. Valencia*, 124 Ariz. 139, 602 P.2d 807 (1979). Moreover, it leads to the inference appellant did not have such scruples that his conduct was such he played only a minor part in the homicides.

Appellant next contends that the additional aggravating circumstances found in the sentencing hearing were not established in accordance with our decision in *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979).

The court below found the existence of A.R.S. § 13–454(E)(1) and (2), providing as follows:

"1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.

2. The defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person."

**172**

The record reflects that the evidence presented supports the finding of these aggravating circumstances. The certified copies of the first degree murder convictions of Greenawalt support the finding of A.R.S. § 13–454(E)(1) because those crimes are punishable by life imprisonment or death in Arizona. A.R.S. § 13–454; *see State v. Steelman*, 126 Ariz. 19, 612 P.2d 475 (1980); *State v. Smith*, 125 Ariz. 412, 610 P.2d 46 (1980). The testimony of Sheriff Ford shows beyond question that Greenawalt had been convicted of a felony in the United States involving the use or threat of violence on another person. A.R.S. § 13–454(E)(2); *see State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied*, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979).

Since the first two aggravating circumstances were properly established and since mitigating circumstances were not established, it is unnecessary to further consider other findings made by the sentencing court as aggravating circumstances enumerated in A.R.S. § 13–454(E)(3), (5) and (6) (now A.R.S. § 13–703(F)(3), (5) and (6)). See *State v. Jordan*, 126 Ariz. 283, 614 P.2d 825 (1980).

Appellant next asserts that the sentencing court erred in its determination as to the existence of the mitigating circumstances enumerated in A.R.S. § 13–454(F)(1) through (4) (now § 13–703(G)(1) through (5)).

The first mitigating circumstance enumerated in the statute reads:

"1. His capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

Appellant's position is that this mitigating circumstance was established through the testimony of Dr. Richard Melendez, a psychiatrist who diagnosed Greenawalt as a borderline organized personality structure, which he characterized as an individual with an " * * * apparent ability to function at relatively high levels of productivity in a conventional sense while at the same time episodically, transiently and under particular circumstances experience breaks with reality comparable to those that are found in the full blown psychotic illness, such as schizophrenia." Dr. Melendez described this kind of person as one who lacks self-identity and when placed around an authoritative figure becomes submissive to the point of blindly following the will of that person. It was his opinion that Gary Tison could have been such a dominant personality in Greenawalt's life at the state prison and that the severe dependence and relinquishment of autonomy which takes place could have been present at the time of the prison escape and sequential events. In his professional medical opinion, it severely disabled appellant's judgment and his ability to perceive reality.

However, Dr. Michael Cleary, called by the prosecution, reached an entirely different conclusion. He criticized the theory relied upon by Dr. Melendez and felt that Greenawalt had not exhibited the extreme signs of dependence usually associated with a borderline organized personality especially because of the independent roles he played in the previous killings of which he had been convicted. Dr. Cleary could find no signs of psychotic behavior necessary for a diagnosis as a borderline organized personality; hence, in his opinion Greenawalt did not suffer from any mental disease or defect which constituted impaired capacity.

In evaluating the merits of the findings of the sentencing court with regard to the existence of the mitigating circumstances, our review of the record has revealed no basis which justifies disturbing the determination of the trial court. The burden of establishing mitigating circumstances rests with the defendant. A.R.S. § 13–454(B); *State v. Smith*, supra; *State v. Watson*, supra. In this matter the lower court was not compelled to accept Dr. Melendez' psychiatric opinion of the mental condition of Greenawalt in the light of the unproven nature of the theory relied upon by Dr. Melendez for his diagnosis and the unsatisfactory explanation of certain events

in Greenawalt's life which, in combination, did not adequately substantiate his claim of impaired capacity within the contemplation of A.R.S. § 13–454(F)(1). *See generally State v. Richmond,* supra; *State v. Brookover,* 124 Ariz. 38, 601 P.2d 1322 (1979); *State v. Evans,* 124 Ariz. 526, 606 P.2d 16 (1980); *State v. Steelman,* supra.

■ Appellant asserts that the court erred in determining that Greenawalt was not under substantial duress at the time of the events in question so as to constitute a mitigating circumstance under A.R.S. § 13–454(F)(2) (now § 13–703(G)(2)). Appellant argues that the testimony by correctional service officers to the effect that he was nervous and shaking during the prison escape and that Kathleen Ehrmentraut's, Greenawalt's companion in Flagstaff, testimony indicated that the Tisons virtually had control over Greenawalt. The prosecution in response argues that any nervous condition from which Greenawalt may have been suffering during the escape can be explained as due to the anxiety surrounding the events because of the underlying fear of either being captured or shot. The prosecution also argues that any claim that the Tisons had complete control over Greenawalt is untenable considering that he was armed throughout and his relative degree of freedom while in Flagstaff with Ehrmentraut. We concur with the interpretation of the facts by the prosecution because we think it is a more reasonable explanation of Greenawalt's behavior.

The appellant's next contention concerns the mitigating circumstances set forth in A.R.S. § 13–454(F)(3) and (4) (now § 13–703(G)(3) and (4)), which provide:

"3. He was a principal, under 13–452, Arizona Revised Statutes, in the offense, which was committed by another, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution.

4. He could not reasonably have foreseen that his conduct in the course of the commission of the offense for which he was convicted would cause,

or would create a grave risk of causing, death to another person."

The trial court did not find either of these circumstances because there was no evidence from which the court could determine that Greenawalt's participation in the murders was relatively minor or that Greenawalt could not have reasonably foreseen that his conduct could cause or would create a grave risk of causing death to another person. Appellant argues that error was committed because without evidence before the court to demonstrate Greenawalt's actual participation in the crimes or that he had reasonably foreseen the risk of causing death, his burden of proof to establish mitigating circumstances had been fully met. We do not find the appellant's reasoning persuasive, however.

■ The burden of proof to establish mitigating circumstances is not met by the lack of proof, as the appellant contends, but by the production of some form of affirmative evidence from which it could be inferred that the defendant's participation was relatively minor or that he could not have reasonably foreseen the risk of death to another person. No evidence in support of subsections (3) and (4) of § 13–454(F), supra, was offered. We hold the claim that these mitigating circumstances should have been found is without merit.

Appellant seems to contend that the prosecution should be required to prove beyond a reasonable doubt the non-existence of mitigating circumstances. We adhere to our decision in *State v. Watson,* supra, where we rejected that contention.

Appellant's argument with regard to the findings of the mitigating circumstances is that the sentencing judge failed to consider some of the mitigating evidence presented by him. We find nothing in the record to support this assertion. As it was stated by the trial judge:

"[a]ll information relevant to any mitigating circumstances, including but not limited to those set forth in Sec. 13–454(F), contained in the presentence report and presented at the sentencing

hearing and received in evidence at the trial of the defendant has been considered by the Court."

■ The appellant contends that the imposition of the death penalty constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. Both the United States Supreme Court and this Court have previously rejected that contention. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *State v. Jordan*, supra; *State v. Madsen*, 125 Ariz. 346, 609 P.2d 1046 (1980); *State v. Watson*, supra; *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977), *cert. denied* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978); *State v. Richmond*, supra.

■ We have considered before appellant's claim that the death penalty statute was not severable and held otherwise. See *State v. Watson*, supra; *State v. Clark*, 126 Ariz. 428, 616 P.2d 888 (1980); *State v. Jordan*, supra; *State v. Steelman*, supra; *State v. Mata*, 125 Ariz. 233, 609 P.2d 48 (1980); *State v. Arnett*, 125 Ariz. 201, 608 P.2d 778 (1980); *State v. Evans*, supra.

■ The appellant claims that our decision in *State v. Watson*, supra, was a prohibited exercise of legislative power which is irreconcilable with the separation of powers concept embodied in Article 3 of the Constitution of the State of Arizona. Appellant bases this assertion on the effect of the *Watson* decision, which is to allow defendants convicted of first degree murder to present any mitigating circumstances at the sentencing hearing. The appellant asserts that the Court engaged in judicial legislation because the decision specifically contradicted the legislative intent in enacting the statute A.R.S. § 13–454(F). We have recently stated that our death penalty is carried out pursuant to a valid and enforceable statute and not by any judicially imposed penalty, *State v. Mata* supra. The decision in *Watson* did not encroach on any function of the legislative branch since it simply carried out the responsibility of the judicial branch, even though there may be in some areas a seeming overlap of responsibility.

The appellant urges that the death penalty statute, A.R.S. § 13–454, under our decision in *Watson* is an *ex post facto* law prohibited by both Article I, Section 10 of the Constitution of the United States, and Article 2, Section 25, of the Constitution of the State of Arizona. This argument was adequately explored in *Watson*. There, in responding to the defendant's contention that the court's action was *ex post facto*, we said:

> "In the instant case, we are only concerned with a procedural change and one which increases the rights of the defendant in death penalty cases. We do not believe there is an ex post facto problem. We find no error." 120 Ariz. at 454, 586 P.2d at 1266.

*See, e. g., State v. Jordan*, supra; *State v. Steelman*, supra; *State v. Arnett*, supra.

■ The appellant claims that our decision in *Watson* constitutes the judicial enactment of a bill of attainder, in violation of Article I, Section 10 of the Constitution of the United States. A bill of attainder under the federal constitutional provision refers to legislative acts which inflict punishment without a judicial trial. *Cummings v. The State of Missouri*, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1866); *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866); *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); *United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). In *United States v. Brown*, supra, the United States Supreme Court stated: " * * * that the Bill of Attainder Clause was intended * * * as * * * a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." 381 U.S. at 442, 85 S.Ct. at 1712, 14 L.Ed.2d at 488. We fail to see any merit in appellant's position, since our decision in *Watson* was a judicial one and did not in any respect usurp a power reserved to the legislative branch. See *State v. Mata*, supra.

The appellant contends that the imposition of the death penalty pursuant to our

decision in *State v. Watson*, supra, violates the concept of fundamental fairness of the due process clause of the Fifth and Fourteenth Amendments to the Constitution of the United States because it failed to give fair warning of the penalty that could be imposed. We rejected this contention in *State v. Jordan*, supra, and concluded that the effect of *Watson* was not unfair but was to the defendant's benefit by allowing the introduction of any mitigating factors at the sentencing hearing.

Appellant urges that the death penalty as set forth in A.R.S. § 13–454 and *State v. Watson*, supra, will be imposed wantonly, arbitrarily and freakishly because no ascertainable standards are provided for the sentencing court to measure the relative weights to be given to the aggravating and mitigating circumstances. This precise point was raised by the defendant in *State v. Mata*, supra. We recognized the problem of resolving the need for flexibility in order to afford individualized decision-making in capital cases and the need for standards to prevent arbitrariness when unbridled discretion rests with the sentencer, but held that our death penalty statute was not violative of due process for this reason. We find it unnecessary to reconsider this issue at this time. See *State v. Jordan*, supra.

■ Appellant argues that the death penalty statute improperly fixes the burden of proof because it requires the defendant to prove the existence of mitigating factors, but does not require the prosecution to establish the existence of aggravating circumstances beyond a reasonable doubt. The first portion of the appellant's argument was answered in *State v. Watson*, supra. Appellant is not denied due process because, as we stated in *State v. Smith*, 125 Ariz. 412, 416, 610 P.2d 46, 50 (1980): "[f]acts which would tend to show mitigation are peculiarly within the knowledge of a defendant." And see *State v. Jordan*, supra.

Finally, appellant urges that the imposition of the death penalty upon a person who has been convicted solely on a felony murder theory constitutes grossly disproportionate punishment and violates the prohibition against cruel and unusual punishment contained in the Eighth Amendment to the Constitution of the United States.

Appellant points out that the instant case went to the jury upon a theory of vicarious liability as the result of the application of the felony murder rule; that by showing that Greenawalt was part of a conspiracy to escape the Arizona State Prison and thereafter to avoid arrest, the State was able to take the case to the jury although it could not establish that he participated in the robbery of the Lyonses, ever fired a shot at the Lyonses or Theresa Tyson, in any way assisted in the robbery or shooting or ever intended that the Lyonses and Theresa Tyson be robbed or killed.

We do not agree, as we have said, that it can be inferred that appellant's part in the murders and robbery was minor. His statements "We didn't kidnap the girl, * * *" and "Well, we left her there" indicate his active participation. Were it otherwise, appellant would have used language such as: "They didn't kidnap the girl, * * *" and "Well, they left her there."

Appellant points to the case of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). There, a plurality of four Justices, Burger, Stewart, Powell and Stevens, held the Ohio statute was unconstitutional because it limited the range of mitigating circumstances which could be considered by the sentencing court. The plurality was joined by concurring opinions from three other Justices, Blackmun, Marshall and White. Justice Blackmun recognized the nature of Arizona's mitigation statute. See footnote 3, 438 U.S. at 615–616, 98 S.Ct. 2954 at 2971, 57 L.Ed.2d at 996–997, and A.R.S. § 13–454(F)(3), quoted supra. He said:

"The more manageable alternative in my view is to follow a proceduralist tack and require * * * that the sentencing authority have discretion to consider the degree of the defendant's participation in the acts leading to the homicide and the character of the defendant's *mens rea*. That approach * * * merely requires that the sentencing authority be permitted to

weigh any available evidence adduced at trial or at the sentencing hearing, concerning the defendant's degree of participation in the homicide and the nature of his *mens rea* in regard to the commission of the homicidal act. A defendant would be permitted to adduce evidence, if any be available that he had little or no reason to anticipate that a gun would be fired, or that he played only a minor part in the course of events leading to the use of fatal force."

Following the decision in *Lockett v. Ohio*, we held in *State v. Watson*, supra, that a restriction on mitigating circumstances "does not pass constitutional muster", saying:

> "The matter will have to be remanded for sentencing at which time the defendant will be allowed to present any mitigating circumstances tending to show why the death penalty should not be imposed." 120 Ariz. at 445, 586 P.2d 1253.

*Watson* stands for the proposition that any relevant evidence of mitigating circumstances can be shown from which the sentencing judge can conclude the death sentence should not be imposed.

It was therefore the law in Arizona at the time of the appellant's sentencing, and since, that a defendant could show at his sentencing hearing his participation in the homicides was relatively minor. This the appellant did not do, nor did he attempt to do so. No evidence was introduced at the sentencing hearing concerning the extent of appellant's participation in these homicides or the nature of his *mens rea* in regard to commission of the homicidal acts. Appellant had the opportunity to show that the death penalty was grossly disproportionate by evidence of the limited degree of his participation. The court specifically found:

> "3. There is no evidence or information of any kind to permit this court to find that the defendant's participation in the murders was relatively minor."

 In sustaining our obligation to review the imposition of the death penalty, see *State v. Richmond*, supra, we have ex-amined in detail the record in this case and have concluded in the light of the wanton disregard for human life, the brutal nature of the killings and appellant's two former convictions of other ruthless murders that the punishment imposed is neither excessive nor disproportionate to the offenses committed.

For the foregoing reasons, the judgments are affirmed.

HOLOHAN, V. C. J., and HAYS, CAMERON and GORDON, JJ., concur.