633 P.2d 335

**STATE of Arizona, Appellee,**

v.

**Ricky Wayne TISON, Appellant.**

No. 4612.

Supreme Court of Arizona,
In Banc.

July 9, 1981.

Rehearing Denied Sept. 10, 1981.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Bruce M. Ferg, David R. Cole, Asst. Attys. Gen., Phoenix, for appellee.

Echeverria, Glenn & Howard by Phillip W. Glenn, Dwight P. Callahan, Casa Grande, and Alan M. Dershowitz, Cambridge, Mass., for appellant.

Alan M. Dershowitz, Cambridge, Mass. and Alice L. Bendheim, Phoenix, for amici curiae American Civil Liberties Union Foundation, Arizona Civil Liberties Union, National Council of the Churches of Christ in the United States, The American Baptist Churches in the U.S.A.

STRUCKMEYER, Chief Justice.

This appeal is by Ricky Wayne Tison from judgments of guilty and death sentences on four counts of first degree murder. He also appeals from judgments of guilty and sentences on three counts of kidnapping, two counts of armed robbery, and one count of theft of a motor vehicle. Jurisdiction of this Court is pursuant to A.R.S. § 13–4031.

On July 30, 1978, appellant and his two brothers, Raymond and Donald Tison, assisted in the escape of their father, Gary Tison, and Randy Greenawalt from the Arizona State Prison. Both appellant's father and Greenawalt were serving life sentences for murder at the time. Appellant's convictions for crimes arising out of the prison escape and subsequent capture twelve days later were recently affirmed by this Court. *State v. Greenawalt, et al.*, 128 Ariz. 388, 626 P.2d 118 (1981).

The five men fled the prison in a green Ford. Later they transferred to a Lincoln Continental. The Lincoln was discovered on August 6, 1978 in Yuma County, Arizona near Quartzsite. In and around the vehicle were the bodies of John and Donnelda Lyons and their twenty-two-month-old son, Christopher. The body of a niece of the Lyonses, Theresa Tyson, was later found approximately one-fifth of a mile west of the Lincoln. All four had died from shotgun wounds.

The Lyonses had left Yuma on the night of July 31, 1978 on a vacation in a late model Mazda. A vehicle matching this description was subsequently discovered in Coconino County, Arizona near Flagstaff.

On August 11, 1978, the appellant, together with the other Tisons and Greenawalt, ran through two roadblocks south of Casa Grande, Arizona in a Ford van. After exchanging gunfire with police officers at the roadblocks, the van turned off into the desert and stopped. Donald Tison was found in the driver's seat of the van. He had been shot in the head. Appellant, his brother Raymond, and Greenawalt were captured nearby in the desert. Gary Tison was found dead several days later further on into the desert.

This Court recently affirmed Greenawalt's convictions and sentences arising from the four murders near Quartzsite. *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828 (1981). Today we affirm Ricky and Raymond Tison's convictions and sentences for these crimes in this opinion and in the companion opinion of *State v. Raymond Curtis Tison*, 129 Ariz. 546, 633 P.2d 355 (1981).

After his capture, appellant made statements describing the prison breakout and subsequent activities, including the four murders. From these statements and other evidence introduced at trial, it was established that the breakout had been planned for some time. Appellant took an active part in the preparation, including obtaining guns and the Lincoln Continental. A gunsmith testified that appellant approached him about sawing off shotguns. The gunsmith also stated appellant, through his mother, purchased a .45 caliber Colt handgun from him. Two cartridges identified as having been fired from this gun were found near the murder scene.

Appellant in his statements explained that the Lincoln became disabled with a flat tire near Yuma. The Mazda was flagged down and all five men pulled guns on the Mazda's occupants, who were taken out of that car and placed in the Continental. Both cars were then taken down another road and parked trunk to trunk. Articles were exchanged between cars, and money and weapons belonging to John Lyons were taken. The Continental was then moved a short distance further, where Gary Tison and Greenawalt shot the victims.

The five men drove off in the Mazda. Within hours, appellant purchased paint to use on the Mazda. A few days later, the repainted Mazda was abandoned in the woods near Flagstaff.

The appellant first contends that a plea agreement which he had entered into should be specifically enforced against the State because, he asserts, he was willing to abide by the terms of the agreement. The agreement provided that appellant would plead guilty to one count of murder in the first degree for a recommended sentence of 25 years to life. In exchange, appellant would:

"* * * appear and testify truthfully in any proceedings pertaining to criminal charges relating to an incident occurring on or about August 1, 1978 in which the John Lyons family and Theresa Tyson were killed."

Appellant thereafter gave statements describing his participation in the murders, but a dispute arose as to the scope of the testimony which he would give in subsequent proceedings. Consequently, appellant withdrew his plea of guilty. Raymond Tison, in response to questions from the trial judge, explained:

"MR. RAYMOND TISON: Okay, the plea agreement says the incident. I figured they were talking about this incident going on up at Quartzsite. I had no idea that you were going to be asking about other people involved, about the escape, all this, and maybe what happened afterwards. I thought it was just going to be that incident. I would be happy to get up there and testify just to that incident, but that's it. I'm not involving nobody else. I'm staying right there. I will start from one time before we came there and before we left or to wherever we left.

THE COURT: Is that your position also, Ricky?

MR. RICKY TISON: Yes."

The appellant's position that the plea agreement should be specifically enforced against the State arises from his understanding of *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). There, the prosecution promised not to make a recommendation for sentencing in exchange for the accused's plea of guilty. At the sentencing hearing, the prosecutor appeared and recommended that the maximum sentence be imposed, contrary to an earlier prosecutor's avowal that no recommendation as to the sentence would be made. The sentencing judge imposed the maximum sentence. The United States Supreme Court, in disapproving the practice, stated:

> " * * * when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." 404 U.S. at 262, 92 S.Ct. at 499.

*Accord, State v. Stone*, 111 Ariz. 62, 523 P.2d 493 (1974). The Court vacated the judgment and remanded to the state court to either allow the defendant the opportunity to withdraw the plea or specifically enforce the agreement against the prosecution.

While the remedy of specific performance of the plea bargain was sanctioned in *Santobello* for the unkept bargains of a prosecutor, it has rarely been used. See Note, The Legitimation of Plea Bargaining; Remedies for Broken Promises, 11 Am. Crim.L.Rev. 771 (1973). And see *United States v. Nathan*, 476 F.2d 456, 459 (2nd Cir. 1973), where specific enforcement of a plea agreement was refused because the defendant failed to disclose the agreed information.

█ The appellant argues in spite of his failure to carry out the terms of the plea bargain that he should be entitled to specific performance. He asserts that he was compelled to withdraw from his plea of guilty because the agreement's scope had been too broadly construed by the prosecution. We disagree. By the terms of the plea agreement, appellant was to provide testimony "in any proceedings", which he has refused to do. His non-compliance with the plea agreement precludes him from the relief requested.

█ It is argued that the language of the plea bargain did not contemplate appellant's testimony as to the conspiracy and the prison breakout, but neither did it explicitly limit his testimony to the events at the scene of the Yuma County murders. A guilty plea will not be set aside because of a "defendant's mistaken subjective impressions * * * absent substantial objective evidence showing such impressions to be reasonably justified * * * ", *State v. Pritchett*, 27 Ariz.App. 701, 703, 558 P.2d 729 (1976); see *State v. Zarate*, 106 Ariz. 450, 478 P.2d 74 (1970). Neither will a plea agreement be specifically enforced according to a defendant's unilateral interpretation of the terms of the bargain in the absence of objective evidence indicating that the interpretation is reasonably justified. See *Adamson v. Superior Court of Arizona*, 125 Ariz. 579, 611 P.2d 932 (1980). In *State v. Cornwall*, 114 Ariz. 550, 552, 562 P.2d 723 (1977), we held:

> " * * * it is the duty of all parties involved to insure that the agreement which is eventually filed with the court contains the exact and complete agreement, no more, no less. And because the requirement to have the exact agreement in writing before the court applies with equal force to the defense, we are of the opinion that, had the defendant wished to plead under a different agreement or had he wished the inclusion of terms and conditions not already contained therein, it was incumbent upon him to object and to require the exact agreement to be evidenced in writing * * *."

█ It is also appellant's contention that the State did not prove he breached the terms of the plea agreement and that an evidentiary hearing on this question should have been conducted by the court below. We think, however, that the State has satisfied its burden of proof because the

unequivocal refusal to testify by the appellant establishes a breach of the plea bargain. Moreover, the claim of error because of the failure to hold an evidentiary hearing on this question is waived since it was not requested in the court below. See *State v. Coward*, 108 Ariz. 270, 496 P.2d 131 (1972).

█ Appellant urges that the trial court erred in not appointing an expert to conduct a public opinion survey to support appellant's motion to change venue. Our statute provides for the appointment of experts in capital cases when such experts are reasonably necessary to adequately present a defense. A.R.S. § 13–1673(B) (now A.R.S. § 13–4013(B)). Constitutional considerations may also mandate the appointment of investigators to aid in preparing a defense. See *Mason v. State of Arizona*, 504 F.2d 1345 (9th Cir. 1974); *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977). But there was no error here in the denial of an expert to conduct a public opinion survey since the expert's findings would have no "bearing on the ultimate question of * * * guilt or innocence" and therefore the expert was not necessary to the preparation of a defense. *State v. Smith*, 123 Ariz. 231, 237, 599 P.2d 187 (1979); see *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828, 833 (1981); *State v. Powers*, 96 Idaho 833, 537 P.2d 1369 (1975).

Appellant urges that the trial court erred in its failure to excuse for cause a juror who expressed an opinion as to the guilt of appellant. On voir dire, the juror first noted that she had been especially moved by the killing of the child and she then expressed a belief that appellant was guilty. But she responded affirmatively when asked if she could judge the case on the evidence presented. When she was challenged for cause, this exchange occurred between the prosecution and the trial judge:

"MR. IRWIN: Your Honor, we think that Mrs. Jackson should be permitted to stay on the jury. That is a fact, of course, that she evinces some emotion. A person wouldn't be a normal person if they didn't. She indicated that she would be able to set aside evidence she had seen in the newspapers, read about, heard about, and try the case fairly on the evidence presented in the courtroom.

THE COURT: Yes, I understood Mrs. Jackson to state that she could judge the case on the evidence produced in the court. The challenge is overruled."

█ The appellant attacks our decision in *State v. Narten*, 99 Ariz. 116, 407 P.2d 81 (1965), as denying him due process because it permits jurors with a preconceived notion of the guilt or innocence of the accused to sit on the jury. In *Narten* we held that jurors possessing an unqualified opinion should be disqualified because it would necessarily carry over and affect their ultimate decision in the case. The fact, however, that a prospective juror possesses an opinion or belief regarding the guilt of the defendant does not mean that the juror would be influenced by that belief and could not render a fair and impartial verdict. See *Burnett v. State*, 34 Ariz. 129, 268 P. 611 (1928). See also *State v. Greenawalt, et al*, 128 Ariz. 388, 626 P.2d 118, 123–124 (1981). The responsibility for determining whether a juror can render a fair and impartial verdict lies with the trial court, and we will not disturb that exercise of discretion absent a clear showing of an abuse of discretion. *State v. Rose*, 121 Ariz. 131, 589 P.2d 5 (1978). The trial judge was satisfied that the juror could deliberate and render a fair and impartial verdict. Without a showing of unqualified partiality of the juror, we will not upset a determination so clearly within the province of the court.

Appellant argues that the trial court improperly denied various pretrial motions urged by appellant. The determinations of these motions also rests within the sound discretion of the trial court and will not be disturbed absent a clear showing of an abuse of discretion and resulting prejudice to the defendant. *State v. Greenawalt, et al*, 128 Ariz. 388, 626 P.2d 118 (1981); *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828 (1981).

Appellant's position is, first, that the trial court erred in refusing to grant a motion for change of venue because of the pretrial publicity.

Rule 10.3(b), Rules of Criminal Procedure, 17 A.R.S. provides:

"Whenever the grounds for change of place of trial are based on pretrial publicity, the moving party shall be required to prove that the dissemination of the prejudicial material will probably result in the party being deprived of a fair trial."

The trial judge learned through voir dire that all of the potential jurors who were needed to obtain a panel of 34 had some familiarity with the events in question. Mere knowledge of the facts of a case standing alone does not mandate a change of venue. See *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828 (1981). It must be shown that prejudicial publicity had the probable effect of precluding a trial by fair and impartial jurors before a change of venue is required. *Id.* Appellant failed to make such a showing. The jury selection process took only a relatively short amount of time. Forty persons were called and only four of those had formed an unqualified opinion as to defendant's guilt. The probability that the members of the jury were prejudicially affected by pretrial publicity is not supported by a review of the record.

In a similar vein, appellant asserts that the trial court erred in its denial of his motions for change of venire and a continuance because of the pretrial publicity. We find no evidence to support his position and the trial court's determination in this regard will not be upset.

Appellant asserts error because the trial court failed to have the jury sequestered. However, the record does not show either juror misconduct or a failure of the jury to follow the admonitions given by the trial judge. *Id.* 624 P.2d at 840.

Appellant asserts that the trial court improperly refused to permit voir dire of each individual juror. The responsibility for conducting voir dire examination lies with the trial judge. The court in its discretion may permit counsel to examine an individual juror when good cause appears. *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d

828, 839–840 (1981); *State v. Smith*, 114 Ariz. 415, 561 P.2d 739 (1977); Rule 18.5(d), Rules of Criminal Procedure, 17 A.R.S.

In the case at bar, the trial judge advised counsel for the appellant that he would be allowed to specifically question prospective jurors once the voir dire examination was completed by the trial judge. The trial judge extensively questioned the prospective jurors in the areas of pretrial publicity, awareness of the appellant's background, any alleged statements attributed to the appellant, and the existence of any prior opinions as to guilt. The trial judge then permitted appellant's counsel to ask questions, and eight of the prospective jurors were questioned by him. We do not understand how the appellant was prejudiced by this procedure. The method adopted by the trial court adequately accomplished the purpose of voir dire to determine whether prospective jurors can fairly and impartially decide the case. *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828, 840 (1981).

Appellant urges that he was deprived of a fair trial guaranteed by the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution because of the pretrial publicity in this matter. He urges first that the newspapers engaged in a practice of "unchecked and irresponsible journalism" creating a carnival-like atmosphere, precluding the possibility of a fair trial as was condemned in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

In *State v. Smith*, 123 Ariz. 231, 599 P.2d 187 (1979), we recognized that the mere dissemination of biased news accounts may so influence the community as to pervade the proceedings and that prejudice would be presumed. However, there still must be shown circumstances so outrageous that it can be concluded the trial was conducted in less than a solemn and sober manner. *State v. Greenawalt, et al*, 128 Ariz. 388, 626 P.2d 118 (1981); see *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). The record fails to disclose the existence of such outrageous

circumstances. It does not appear that the trial was conducted in a manner other than solemn and sober. In the absence of circumstances from which prejudice can be presumed, appellant must show that specific publicity of a prejudicial nature reached the prospective jurors. *State v. Greenawalt, et al,* 128 Ariz. 388, 626 P.2d 118 (1981); *State v. Smith,* 116 Ariz. 387, 569 P.2d 817 (1977).

An examination of the record leads to the conclusion that during the occurrence of the events in question, especially after the escape from the state prison and after the appellant's implication in the murder of the Lyons family, press coverage was very extensive. While the hunt for the Tisons was in progress, appellant and his accomplices were the subject of numerous front page articles. However, the degree of press interest lessened after the discovery of the body of Gary Tison, the group's reputed leader. The record does not show that prior to the trials of Randy Greenawalt and appellant and his brother, Raymond, the press coverage rose to the level it occupied at the time the offenses occurred. But were it otherwise, the magnitude of the publicity will not alone result in a reversal. There must be a showing by the accused of some prejudicial effect of the publicity. *State v. Greenawalt,* et al., 128 Ariz. 388, 626 P.2d 118, (1981).

The presence of publicity-caused jury prejudice can usually be found by an examination of two common factors: the nature of the publicity and the difficulty in selecting a jury. Neither factor is present to the extent that would tend to indicate the presence of prejudice. The pretrial publicity not only tapered off near the appellant's trial date, but, in addition, only a few of the many newspaper articles that were written could be said to be inflammatory. Of those, the articles appearing on the editorial page of the Arizona Republic, a Phoenix newspaper, were the most incendiary. Only one juror who participated in the deliberations read the Arizona Republic, and that person stated that he had not formed any preconceived opinions as to the appellant's guilt.

The relative ease with which the jury selection process took place is also indicative of a lack of prejudice. Only 40 prospective jurors were needed to fill the requisite panel of 34. Of these, only four were excused by the court for their fixed opinion of the appellant's guilt. Of the 34 on the panel, none had formed any preliminary opinions about the case, nor had any of them heard of any alleged statements made by appellant, his brother, or Randy Greenawalt, nor did those on the panel possess any knowledge of the prior history and background of appellant. Unless there are objective indications of jurors' prejudice, we will not presume its existence.

In his sixth assignment of error, appellant claims that the trial court erred in failing to suppress three incriminating statements which were made by appellant subsequent to his capture and while incarcerated at the Pinal County Jail in Florence, Arizona. He urges several grounds for the exclusion of these statements, including assertions that they were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the Sixth Amendment right to counsel. We will not, however, concern ourselves with these matters because of the failure to raise these issues at the suppression hearing held in the court below. Issues concerning the suppression of evidence which were not raised in the trial court are waived on appeal. *State v. Griffin,* 117 Ariz. 54, 570 P.2d 1067 (1977); see Rule 16.1(c), Rules of Criminal Procedure, 17 A.R.S. The preclusion of issues applies to constitutional objections as well as statutory objections because an adherence to procedural rules serves a legitimate state interest in the timely and efficient presentation of issues. *State v. Griffin,* supra; *State v. Neese,* 126 Ariz. 499, 616 P.2d 959 (App.1980); see *Michigan v. Tyler,* 436 U.S. 499, 512, n. 7, 98 S.Ct. 1942, 1951, n. 7, 56 L.Ed.2d 486 (1978). When a defendant chooses legal representation, the power of decision is delegated to the lawyer, see Standard 4-5.2, Standards for Criminal Justice, and his decisions may be binding upon the defendant, even though

rights of constitutional dimensions have been lost. See *Wainwright v. Sykes*, 433 U.S. 72, 91, 97 S.Ct. 2497, 2509, 53 L.Ed.2d 594 (1977) (Burger, C.J., concurring); *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Henry v. Mississippi*, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965). Thus, the challenge to the admissibility of the statements on the grounds of involuntariness preserved for review only that issue.

An examination of the voluntariness of the statements given by appellant requires a further elaboration of the facts.

On August 11, 1978, in the early morning hours, a Ford van approached a roadblock set up near Casa Grande, manned by a number of law enforcement officers. When the officers attempted to check the vehicle, gun shots were fired from it. Thereafter, a high speed chase ensued for eight to ten miles, with gunfire coming from the rear of the van. At a second roadblock, the van was stopped after running off the highway. The officers saw several of the occupants fleeing into the desert, and upon searching the van found Donald Tison, who was unconscious with a gunshot wound in his head. Later, with the assistance of helicopters equipped with search lights and aerial flares, the officers located and arrested appellant, his brother Raymond Tison and Randy Greenawalt hiding a short distance from the van. After being stripped, searched, handcuffed and shackled, they were placed in the bed of a pickup truck while the officers continued their search for Gary Tison.

At 5:30 a. m., appellant was placed in a police vehicle along with three officers (Harville, Solis and Martinez). At that time, appellant was nude except for a blanket which had been put over him. Appellant had blood spattered on his chest, apparently from the gunshot wound sustained by Donald Tison. Appellant was advised of his *Miranda* rights and asked about his physical condition. He responded that he was all right and did not need a doctor. During this time he was neither threatened nor intimidated in any manner. There was some evidence that a statement was made to the appellant that he would be taken back and shown his brother, Donald. Appellant was questioned for a period of approximately ten to fifteen minutes. The interview terminated when appellant failed to disclose the information which the officers were attempting to obtain.

The second interview was conducted by Department of Public Safety Officers Salyer and Sanchez at approximately 7:00 a. m. The appellant was still nude, but in possession of the blanket. He was placed in the back seat of a vehicle in which the two officers sat in the front seat. Appellant was advised of his *Miranda* rights and "he just shrugged his shoulders" and began to talk. Officer Salyer's testimony at the trial indicates what transpired:

"A. Well, first I asked Ricky if he was okay, if he was hurt, if he needed any medical attention. He stated no. I offered him some coffee, something to eat. Again he refused.

Q. [sic]: My one concern was to ascertain if Gary Tison was in fact with the group and the location of the girl that hadn't been found.

As I talked to Ricky about the—he first stated all they did was break the old man out. As I got to the point about the white Lincoln he became very excited. Said he didn't want to talk anymore. Didn't know anything about the Lincoln.

At this time I started to get out of the car when someone came by and mentioned something about footprints.

Q. Did you return to the car at that time?

A. I hadn't left the car.

Q. What did you say at that time?

A. I told Ricky that there had been footprints found around the scene of the Lincoln and I asked him about what type shoes he was wearing. Again he became excited, said, 'All I know is that me and my brothers didn't shoot those people.'

Q. What was your next statement?

A. I said, 'Okay, I didn't say that you shot those people. I'm just trying to find out what happened.'

I said, 'Let's just start at the beginning from when the thing first started and just go from there.' "

Appellant then related in some detail their activities, including a description of the murders of the Lyons family.

The third statement of appellant which was introduced at his trial occurred at the Pinal County Jail on the same day at approximately 12:40 p. m. Tom Brawley, of the Coconino County Sheriff's Office, questioned appellant. At this time he was neither wearing clothes nor did he have a blanket. He was advised of his *Miranda* rights and was not threatened in any manner. Brawley testified:

"A. I asked if he wanted to make a statement.

Q. What was his response?

A. He said that he didn't at that time.

Q. What happened next?

A. I then told him that we had a missing person in the case that we would like to find.

Q. What was his response to that?

A. He replied, 'Well, that's a bunch of shit about the girl.' He said, 'We didn't—' or he said, 'I'm not a sex fiend,' He said, 'We didn't take her with us. We left her there at the car.' "

Counsel for appellant at the hearing on a motion to suppress urged that the statements were inadmissible because of their involuntary nature.

■ In Arizona, confessions and admissions are *prima facie* involuntary and the burden is on the State to show by a preponderance of the evidence that they were freely and voluntarily made and not the product of physical or psychological coercion. The trial court's determination of the admissibility of a confession will not be disturbed in the absence of clear and manifest error. *State v. Hall*, 120 Ariz. 454, 586 P.2d 1266 (1978).

■ In determining the voluntariness of a confession, the trial judge must assess the totality of the circumstances surrounding the confession and decide whether the free will of the defendant has been overborne. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Hall*, supra. "A confession will be found involuntary where the court, considering all the circumstances, determines that one of the following exists: (1) impermissible conduct by police, (2) coercive pressures not dispelled, or (3) confession derived directly from prior involuntary statement." *State v. Gretzler*, 126 Ariz. 60, 82, 612 P.2d 1023 (1980). None of the factors enumerated in *Gretzler* exist in the present case. We find no clear and manifest error in the trial court's denial of the appellant's motion to suppress.

■ An examination of the circumstances surrounding the giving of appellant's statements supports the trial court's conclusion that they were voluntary. He chose to speak on three separate occasions after having been advised of his *Miranda* rights. The law enforcement officers who conducted the interrogations never threatened or coerced him, nor did they promise any benefits from his cooperation with them. The questioning lasted for only short periods of time. The officers provided appellant with a blanket and offered him medical attention and food. Considering all the circumstances, the facts do not indicate that the statements were involuntary, but, rather, that they were the product of the appellant's exercise of free will.

■ Appellant challenges an instruction given by the trial judge which purported to describe conspiracy and the liability of persons in a conspiracy. This is the same instruction quoted in *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828, 846–847 (1981). There we found no reversible error in the giving of the instruction even though, as here, the appellant had never been indicted or prosecuted for conspiracy. We recognized that the instruction stated the liability imposed by Arizona's criminal responsibility statute, A.R.S. § 13–139 (now A.R.S. § 13–301 et seq.):

"All persons concerned in the commission of a crime * * * whether they directly

commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission * * * are principals in any crime so committed."

Since appellant here was not convicted of conspiracy, his various arguments that the instruction did not reflect the law of the substantive crime of conspiracy or that there was insufficient evidence to warrant a conspiracy instruction are irrelevant. Substantial evidence showed appellant's participation in the prison breakout, the robbery and kidnapping of the Lyonses and Theresa Tyson and the effort to avoid capture.

Arizona's statute A.R.S. § 13–542 provided:

"A murder * * * which is committed in avoiding or preventing lawful arrest or effecting an escape from legal custody, or in perpetration of or attempt to perpetrate * * * robbery * * * [or] kidnapping * * * is murder of the first degree."

The jury could have concluded from the evidence that the murders of the Lyons family and Theresa Tyson were committed either in avoiding lawful arrest, effecting an escape from legal custody, or in the perpetration of robbery or kidnapping. By force of A.R.S. § 13–139, appellant was therefore a principal in the homicides.

As we said in *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d at 848:

"While the requested instruction involving conspiracy added nothing to the State's theory of responsibility for the murders, under the felony murder statute, A.R.S. § 13–452, neither do we think it misled or confused the jury."

■ Appellant argues that due process requires that the conspiracy be charged in the indictment. It is true that there is a fundamental right to reasonable notice of the specific charge against an accused. *Cole v. State of Arkansas*, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948). Appellant was informed of the crimes of which he could be convicted. There is no requirement that appellant receive notice of how his responsibility for those offenses was to

be proved. See *Hunter v. State of Arizona*, 47 Ariz. 244, 55 P.2d 310 (1936); *State v. Mendibles*, 25 Ariz.App. 392, 543 P.2d 1149 (1975); *People v. Pike*, 58 Cal.2d 70, 22 Cal.Rptr. 664, 372 P.2d 656, 666 (1962); *People v. Remiro*, 89 Cal.App.3d 809, 153 Cal. Rptr. 89 (1979).

Appellant next assigns as error the felony-murder instructions given by the court. First, appellant asserts that the trial judge failed to detail the "elements" of "avoiding or preventing lawful arrest or effecting an escape from legal custody" contained in former A.R.S. § 13–452.

■ Appellant never requested a more detailed explanation of the terms and never objected to the instruction given. Any error in instructions not objected to is waived unless the error is fundamental. *State v. Dickey*, 125 Ariz. 163, 169, 608 P.2d 302 (1970); see Rule 21.3(c), Rules of Criminal Procedure, 17 A.R.S. Where the trial court fails to instruct on a matter vital to the rights of a defendant, such an omission constitutes fundamental error. *State v. Miller*, 120 Ariz. 224, 585 P.2d 244 (1978); *State v. Hardy*, 112 Ariz. 205, 540 P.2d 677 (1975); *State v. Evans*, 109 Ariz. 491, 512 P.2d 1225 (1973). In *State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739 (1977), we held fundamental error to be "error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial."

■ Appellant incorrectly terms the "avoiding or preventing lawful arrest" and "escape from legal custody" contained in the first degree murder statute, former A.R.S. § 13–452, as "underlying felonies." That statute provided in its entirety:

"A murder which is perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, deliberate or premeditated killing, or which is committed in avoiding or preventing lawful arrest or effecting an escape from legal custody, or in the perpetration of, or attempt to perpetrate, arson, rape in the first degree, robbery, burglary, kidnapping, or mayhem, or sexual molestation of a child under the age of thirteen years,

is murder of the first degree. All other kinds of murder are of the second degree."

In *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828 (1981), we recognized that the "arrest" and "escape" are not underlying felonies, but, rather, specified conduct. There we said:

" * * * the State *must* present evidence sufficient to show that the murders were committed in 'avoiding or preventing lawful arrest or effecting an escape from legal custody,' or any of the other proscribed acts. Where the accused is charged with first degree murder, based upon the felony-murder statute, which itself requires a showing of another underlying crime or specified conduct *as an element* of the offense charged, evidence of the proscribed conduct cannot be precluded as being irrelevant or prejudicial."

624 P.2d at 844. (Emphasis in original.)
Put simply, no elements of the underlying crimes of "avoiding or preventing lawful arrest or effecting an escape from legal custody" were required since the terms as used in A.R.S. § 13–452 are not underlying felonies. Still the question remains whether the instruction sufficiently described the terms so as not to amount to fundamental error. *People v. McGhee*, 67 Mich.App. 12, 239 N.W.2d 741 (1976); see *United States v. Brown*, 616 F.2d 844 (5th Cir. 1980).

The underlying conduct which appellant claims was not sufficiently explained was never disputed. Appellant does not argue that the murders of the Lyons family and Theresa Tyson occurred in any manner other than in an effort to avoid arrest. Any prejudice to appellant from the court's failure to give a more particularized instruction is difficult to conceive. The conduct is, to a great extent, self-defining and a further explanation would have assisted the jury very little. It does not appear that the jury was misled. We find no fundamental error.

■ The appellant argues that the trial court erred in refusing to give an instruction on the termination of the underlying felonies or conduct regarding the application of the felony murder rule. He contends that the State has not shown any causal connection between the deaths and the crimes or conduct in this matter which underlie the application of the felony murder rule. We think the appellant's position ignores the undisputable facts in this case. By the appellant's own statements, it is clear the murders occurred in the attempt to avoid lawful arrest and contemporaneously with the armed robbery and kidnapping of the Lyons family and Theresa Tyson. Thus, the murders took place during a series of events sufficiently causatively connected to the underlying crimes or conduct to support the instruction given. See *State v. Gretzler*, 126 Ariz. 60, 89–90, 612 P.2d 1023 (1980); *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976).

■ In his twelfth assignment of error, appellant urges that the trial court failed to instruct the jury on second degree murder. In *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828, 846 (1981), we held that the requested second degree murder instruction was properly refused because the evidence supported only the conclusion that the murders were committed during conduct specified in or in the perpetration of an offense enumerated in A.R.S. § 13–452. No evidence supported a second degree murder instruction. We likewise so hold here.

■ Appellant urges that the trial court erred in giving a flight instruction when the only evidence of flight was the appellant's capture a few hundred yards from the van in which he was riding when apprehended. It is the appellant's position that such evidence of flight manifested no consciousness of guilt on the part of appellant regarding the present charges, but bore relation only to the assaults occurring at the scene of the roadblock. We find no error in the trial court's giving of the flight instruction for the following reason. A flight instruction is permissible when evidence exists of open flight or of concealment. *State v. Clark*, 126 Ariz. 428, 434, 616 P.2d 888 (1980). "Evidence concerning flight is admitted because flight raises an inference which, when taken together with

**540**

other evidence, points to a consciousness of guilt on the part of a defendant." *State v. Loyd,* 126 Ariz. 364, 367, 616 P.2d 39, 42 (1980).

In the instant case, the record is replete with evidence of both open flight and concealment. After the homicides, appellant with his companions first stole the Lyonses' Mazda and painted it a different color. They then went to Flagstaff and changed to another vehicle, a pickup truck. Before leaving Flagstaff, they partially buried the Mazda and covered it with pine branches. Subsequently, they abandoned the pickup truck and obtained a van. When the appellant and the other members of the group were approached by law enforcement officers at the first roadblock near Casa Grande, they responded with gunfire and attempted to escape. A chase ensued with the occupants of the van shooting at the pursing law enforcement vehicles. Appellant, his brother Raymond and Randy Greenawalt were taken into custody after being discovered hiding in the desert. It can reasonably be concluded that such conduct evidences a consciousness of guilt of prior criminal activities. Appellant's attempt to characterize their flight as only a flight from the events taking place at the roadblock does not explain their violent behavior upon confrontation by peace officers, which of itself was part of the flight.

Appellant asserts that the trial court committed error in denying appellant's request for transcripts of Randy Greenawalt's trial, which was conducted immediately prior to appellant's. Greenawalt, an accomplice of appellant, was charged with the same substantive charges made against appellant.

The United States Supreme Court in *Britt v. North Carolina,* 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), held that an indigent defendant must be provided with transcripts of a prior trial that ended in a mistrial without showing a specific need. The necessity of the transcripts to an effective defense was to be presumed. But in an analogous situation, the Court through Justice Rehnquist said:

" * * * the fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required. The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process." *Ross v. Moffitt,* 417 U.S. 600, 616, 94 S.Ct. 2437, 2447, 41 L.Ed.2d 341 (1974).

Hence, when the indigent defendant requests a transcript of a co-defendant's trial, its necessity to an effective defense is not presumed. Rather, a defendant must show specific need. *State v. Razinha,* 123 Ariz. 355, 599 P.2d 808 (App.1979). In distinguishing *Britt,* the court in *State v. Razinha* said:

"The reason for distinguishing between the *Britt* situation, a prior mistrial, and a situation analogous to the one here, a trial of a co-defendant, is that the witnesses may not be common. Even if they are, their testimony as to the co-defendant may differ greatly from their proposed testimony concerning the defendant's part in the crime, depending upon the circumstances of each case." 123 Ariz. at 358, 599 P.2d 808.

While the witnesses were the same in Greenawalt's and appellant's trials, there must still be a showing of specific need. No such need was established. Appellant did not and does not on appeal elaborate on how the transcripts would have assisted in either trial preparation or impeaching witnesses.

More important, as stated in *State v. Littles,* 123 Ariz. 427, 429, 600 P.2d 40 (App. 1979):

"*Britt* does not stand for the proposition that an indigent defendant is absolutely entitled to a transcript of the prior proceedings under all circumstances. It is only where the transcript is available to others for a price that the principles of *Britt* apply. Here, the transcript was not available to anyone. We do not believe

that under the circumstances the trial court was required to delay the trial some unknown time in the future in order to secure the transcript."

Randy Greenawalt's trial was completed on February 16, 1979. Appellant's trial commenced February 20, 1979 and ended February 27. It appears the transcripts of Greenawalt's trial were not prepared and available until May 4, 1979. The transcripts not being available to others, they were not required to be provided to appellant.

 Appellant contends that the sentences of life imprisonment without the possibility of parole he received on the kidnapping convictions were illegal in the absence of evidence that he personally injured the victims.

A.R.S. § 13-492(C) provides:

"1. If the person subjected to the acts mentioned in subsection A or B suffers serious bodily harm *inflicted by the person found guilty*, the person found guilty shall be punished by life imprisonment without possibility of parole.

2. If the person subjected to any acts mentioned in subsection A or B does not suffer serious bodily harm the person found guilty shall be punished by imprisonment in the state prison from twenty to fifty years without possibility of parole until the minimum sentence has been served." (Emphasis added.)

If subsection (1) is read literally, § 13-492(C) provides no punishment where the victim is bodily harmed but the particular defendant is not shown to have personally inflicted the harm. The State's position is that the legislative intent in the enhancement of sentence was to deter kidnappers from injuring their victims by distinguishing between injury and non-injury cases, not between injuring and noninjuring kidnappers. We agree, and hold that the sentence enhancement in A.R.S. § 13-492(C)(1) comes into play whenever a kidnapping victim is bodily harmed, even though the particular defendant convicted of kidnapping did not personally inflict the harm.

Before addressing the appellant's challenge to the determination by the sentenc-

ing judge that the sentences of death were appropriate for this defendant on these facts, the appellant has raised various issues concerning the constitutionality of our death penalty statute. Specifically, he asserts that: (1) the death penalty constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution; (2) the decision in *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), is unconstitutional because the mitigation provisions of the statute are not severable from the remainder of the statute; (3) the decision in *State v. Watson*, supra, is a prohibited exercise of legislative power and constitutes a judicial enactment of a bill of attainder prohibited by Article I, Section 10 of the United States Constitution; (4) the death penalty as re-created by *State v. Watson*, supra, will be imposed wantonly, arbitrarily and freakishly because it contains no ascertainable standards for the sentencing body to measure the relative weights of the aggravating and mitigating circumstances; and (5) the statute improperly allocates the burden of proof in requiring the defendant to prove the existence of mitigating factors and not requiring the prosecution to establish aggravating circumstances beyond a reasonable doubt. These issues have been resolved in *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828 (1981), and it is unnecessary to reconsider them at this time.

Appellant complains that the trial court erred in determining the existence of three aggravating circumstances from which it concluded to impose a death sentence. By A.R.S. § 13-454(D) and (E) (now A.R.S. § 13-703(E) and (F)), the court shall impose a sentence of death if it finds one or more of the aggravating circumstances enumerated in subsec. (E) and that there are no mitigating circumstances "sufficiently substantial to call for leniency." A.R.S. § 13-454(E) provides:

"Aggravating circumstances to be considered shall be the following:

1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence

of life imprisonment or death was imposable.

2. The defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person.

3. In the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the victim of the offense.

4. The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

5. The defendant committed the offense as consideration for the receipt or in expectation of the receipt, of anything of pecuniary value.

6. The defendant committed the offense in an especially heinous, cruel, or depraved manner."

The appellant complains that the sentencing court found the presence of an aggravating circumstance pursuant to A.R.S. § 13–454(E)(3). He argues that the court erred in finding this because its applicability is limited to those factual situations where a grave risk of death has been created which threatens persons other than the intended victims. In essence, the appellant is urging that the simultaneous multiple murders where all the victims met their deaths cannot be construed to result in a finding of aggravation consistent with this statutory provision. We, too, have trouble rationalizing the aggravating circumstance set forth in A.R.S. § 13–454(E)(3) (now A.R.S. § 13–703(F)(3)) with the facts of this case.

The finding by the sentencing court of the existence of this aggravating circumstance does have some support in the evidence. The body of John Lyons was found near the Lincoln automobile in which the bodies of Donnelda and Christopher Lyons were found. They were close enough together to suggest that the shooting of any one of the three created a grave risk of danger to the other two, particularly in the case of Donnelda and Christopher Lyons. But, taking all the facts into consideration,

there is a suggestion that all four were ruthlessly and intentionally murdered. We think the evidence could be viewed in the light of the latter hypothesis and therefore we cannot conclude that § 13–454(E)(3) has any application to this case.

The sentencing court found the existence of the aggravating circumstances in A.R.S. § 13–454(E)(5) (now A.R.S. § 13–703(F)(5)):

"The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."

Appellant's position is that in conjunction with (E)(4), the legislative intent was to apply this section only to the "hired gun" or "contract killer." However, we have previously held to the contrary in State v. Clark, supra. There, we approved the finding of an aggravating circumstance upon evidence of a robbery-murder. We found that the multiple murders in that case were committed for financial gain because the defendant had stolen money, credit cards, two diamond rings and an automobile. Id. 126 Ariz. at 436, 616 P.2d 888; see also State v. Madsen, 125 Ariz. 346, 609 P.2d 1046 (1980). Here, the appellant's statements along with other evidence revealed that the Lyonses' vehicle was stopped after the Lincoln became disabled. The Lyonses' automobile and various items of personal property were stolen. According to appellant's statements appearing in a psychological evaluation offered in evidence at the mitigation hearing, "the whole purpose was to obtain an automobile."

The appellant also challenges the sentencing court's finding that the offenses were committed "in an especially heinous, cruel, or depraved manner." A.R.S. § 13–454(E)(6) (now A.R.S. § 13–703(F)(6)). He asserts that the murders were carried out by the infliction of numerous shotgun blasts causing instantaneous death to all of the victims except Theresa Tyson, and that no additional facts exist which set this first degree murder apart from the usual one. In the special verdict, the sentencing judge said:

"This finding is based on the evidence that the victims' vehicle was stopped, they and the vehicle were moved from the highway into the desert, and some, if not all, of the victims were placed in the Lincoln automobile where at least Donnelda Lyons and Christopher Lyons were murdered. Clearly the fatal wounds of John Lyons and Theresa Tyson were inflicted in or near the Lincoln. The conclusion is inescapable that all the victims were moved from the highway under force and, considering the arsenal possessed by the defedants [sic] and the manner in which the victims were killed, very probably at gun point. Necessarily John Lyons, Donnelda Lyons and Theresa Tyson had time to become and must have become apprehensive about their welfare and that of Christopher at first and ultimately about all their lives before the fatal shots were fired. The stress and fear each must have initially experienced had to have grown to immense, almost unimaginable proportions before they were murdered. And it is not unreasonable to conclude that one or more of the victims witnessed the murder of the others before his or her turn came, and that very likely, from where they were found, Theresa Tyson and John Lyons were those witnesses. The emotions certainly experienced by John Lyons, Donnelda Lyons and Theresa Tyson in those last minutes of their lives were the equivalent of the severest physical torture.

This finding is also based on the senselessness of the murders. It was not essential to the defendants' continuing evasion of arrest that these persons be murdered. The victims could have easily been restrained sufficiently to permit the defendants to travel a long distance before the robberies, the kidnappings and the theft were reported. And in any event the killing of Christopher Lyons, who could pose no conceivable threat to the defendants, by itself compels the conclusion that it was committed in a depraved manner."

In *State v. Ceja*, 126 Ariz. 35, 39, 612 P.2d 491 (1980), we explained the meaning of the terms embraced by (E)(6):

"The aspect of cruelty involves the pain and the mental and physical distress visited upon the victims. Heinous and depraved go to the mental state and attitude of the perpetrator as reflected in his words and actions."

*Accord State v. Bishop*, 127 Ariz. 531, 622 P.2d 478 (1980); *State v. Clark*, supra. For a finding of cruelty, we have required that evidence of the suffering or pain experienced by the victims be apparent. *State v. Clark*, supra; *State v. Ceja*, supra. In the instant case, no evidence was offered to establish pain or suffering by the victims other than the medical testimony indicating that Theresa Tyson did not die instantly, but bled to death. However, the sentencing judge surmised that the victims must have experienced a great degree of mental pain by being moved from the highway at gunpoint in apprehension of the possibility of eventually being murdered and through witnessing the commission of the murders on the other family members. Such a conclusion is reasonable on these facts, but we do not rest our approval of the findings of (E)(6) alone on the existence of cruelty.

The evidence supports a finding that the murders were committed in a heinous and depraved manner. The senselessness of the murders, given the inability of the victims to thwart the escape, especially in such an isolated area, and the fact that a young child, less than two years old, who posed no threat to the captors, was indiscriminately shot while in the arms of his mother, compels the conclusion that the actual slayers possessed a shockingly evil state of mind. Less violent alternatives which would have served their purposes in preventing their detection by the authorities were obviously available. But they chose to slaughter an entire family and Theresa Tyson. The crimes were well within the plain meaning of the legislative language "especially heinous * * * or depraved * * *."

Appellant also argues that this aggravating circumstance, "especially heinous, cruel or depraved," was improperly found by the sentencing court because A.R.S. § 13–

454(E)(6) contemplates active personal involvement in the homicides and the only evidence before the court indicated that the appellant did not personally participate although he was present at the scene of the shooting. We reject this notion and construe the statute to mean that a defendant who is actually present at the homicide, having actively participated in all the events leading thereto, will not be heard to deny that he was not causally connected with the crime at the highest level and in the fullest sense. But for the appellant's assistance from the moment he and his brothers furnished guns to Gary Tison and Greenawalt, the victims would not have died.

Further, we believe that the lower court mistakenly concluded that A.R.S. § 13–454(E)(1) and (2) should not apply.

Appellant was convicted of seventeen counts of assault with a deadly weapon for his participation in the events taking place at the prison and at his capture in Pinal County. As a result of these convictions, appellant received concurrent sentences on each count of 30 years to life. See *State v. Greenawalt, et al*, 128 Ariz. 388, 626 P.2d 118 (1981). The trial court's belief that the charges could have been brought in a single information or indictment along with the charges in this case unduly limits the statutory reach of the legislative act. The criminal offenses which occurred in Pinal County constitute separate offenses. They arose out of different incidents which had taken place at the prison and at the roadblock. These convictions were punishable by life imprisonment and, therefore, should have been considered aggravating circumstances under (E)(1).

The convictions were also an aggravating circumstance under (E)(2): appellant "was previously convicted of a felony in the United States involving the use or threat of violence on another person." The felony convictions of assault with a deadly weapon necessarily involved the type of violent behavior against which this aggravating circumstance is directed. That some of the offenses occurred subsequent in time to the offenses which are now upon review does not alter our conclusion. The consideration of these convictions as aggravating circumstances regardless of the time of their occurrence serves the legitimate purpose of the statute to evaluate the character and propensities of the appellant. *State v. Steelman*, 126 Ariz. 19, 612 P.2d 475 (1980); *State v. Valencia*, 124 Ariz. 139, 602 P.2d 807 (1979). See also *State v. Superior Ct. of State of Ariz., Etc.*, 128 Ariz. 583, 627 P.2d 1081 (1981).

█ We do not, however, base our decision on subsections (E)(1) and (2), being satisfied that subsections (E)(5) and (6) fully support the death sentences.

Appellant argues that in addition to the mitigating circumstances found by the trial judge (age, minimal prior criminal activity and convictions based on the felony murder rule), other mitigating circumstances exist. Appellant claims the psychological reports on his mother and himself establish the strong, manipulative influence his father, Gary Tison, had on him. We, however, conclude the report does not support this argument. While Dr. MacDonald, the psychologist, believed Gary Tison applied subtle and continual influence on appellant, he concluded appellant suffered from no thought disorders and:

> "became involved in these events on his own volition, planning it carefully, not under the influence of drugs or alcohol, *not under any threat or undue persuasion* and certainly not while in a state of psychosis or high mental disturbance." (Emphasis added.)

█ The facts also do not support appellant's contention. There was substantial evidence that appellant along with his brothers planned the escape from the beginning and that he continued with his father and Greenawalt both before and after the murders, even though there were obvious opportunities to dissociate himself from them.

█ Appellant also argues as mitigating circumstances that numerous persons wrote letters on his behalf, pointing out his prior

non-violent character, and the fact that he did not actually commit the murders. However, we are not impressed. The evidence from beginning to end establishes the ruthless character of the participants in the offenses. Appellant planned the escape for months with his brothers. During that time they gathered together an arsenal of lethal weapons which were used against others during the prison breakout. Later the same weapons were used by appellant and his companions to kidnap, rob, and finally murder the Lyons party. Appellant obviously possessed the capacity to engage in violent behavior when it suited his preference.

It is argued that appellant's participation in the murders was relatively minor and that he should not be sentenced to death since he did not specifically intend the victims' deaths. The trial court, however, found as to both Ricky and Raymond Tison:

"Neither defendant's participation was relatively minor. Although each of the defendants has stated the murders were actually committed by Gary Tison and Randy Greenawalt, the participation of each in the crimes giving rise to the application of the felony murder rule in this case was very substantial. Even accepting as true their statements of who actually fired the fatal shots, it cannot be said that their participation was relatively minor. By their own statements their participation up to the moment of the firing of the fatal shots was substantially the same as that of Randy Greenawalt and Gary Tison. At the moment of the firing their participation may not have equalled that of Randy Greenawalt and Gary Tison, but their standing and watching then [sic] while armed themselves cannot be characterized as relatively minor participation."

The record establishes that both Ricky and Raymond Tison were present when the homicides took place and that they occurred as part of and in the course of the escape and continuous attempt to prevent recapture. The deaths would not have occurred but for their assistance. That they did not specifically intend that the Lyonses and Theresa Tyson die, that they did not plot in advance that these homicides would take place, or that they did not actually pull the triggers on the guns which inflicted the fatal wounds is of little significance. Ricky and Raymond Tison associated themselves with others who were willing to and had in the past committed savage, homicidal acts. They were palpably indifferent to the consequences of their lawless conduct. They will not be relieved of the punishment the law exacts where the criminal association was formed, supported and carried out irrespective of the probable consequences that human life would be taken to ensure the success of the criminal enterprise. We assent to the retributive principle of justice which demands that persons be punished in proportion to their personal involvement in the crime, focusing the inquiry on the harm which may fairly be attributed to a participant's conduct. See U.S.Const. amend. VIII. This is not a case of minimal assistance. *Compare Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

If a crime is caused to occur by an accessory but the accessory is not the actual perpetrator, this fact will not alone constitutionally prevent punishment of the accessory to the same extent as the perpetrator since both have caused the death to occur. See Dressler, The Jurisprudence of Death by Another: Accessories and Capital Punishment, 51 U.Colo.L.Rev. 17, 54 (1979). The extent of the accessory's participation was substantial. As a minimum, the Tison brothers stood by, armed with guns, while their companions slaughtered the Lyonses and Theresa Tyson. The mitigating circumstances are not "sufficiently substantial to call for leniency."

Judgments of conviction and sentences affirmed.

HOLOHAN, V. C. J., and HAYS and CAMERON, JJ., concur.

GORDON, Justice (specially concurring):

Although I would affirm all the judgments and sentences in this case, I still feel as I did in *State v. Clark*, 126 Ariz. 428, 616 P.2d 888 (1980) that when A.R.S. § 13–454(E)(4) and (5) are read together it is clear that the Legislature intended those sections to apply only to situations involving a homicide committed by a hired killer. I do not believe that they were intended to be applied to homicides occurring in the course of robberies. To that extent I would disagree with the majority.